*1707 The opinion of the court was delivered by
Monroe, J.
Plaintiff, as the dative tutor of the minor, Louis Craig, claims that said minor was summarily and unlawfully ejected by a servant of defendant from its train, whilst the same was in motion, with the result that the car wheels passed over his left arm and so mangled it that amputation was necessary.
ILe alleges that the minor was guilty of no negligence, and that he has sustained damages to the amount of $10,000, for which he prays judgment. Defendant denies fault on its part and alleges that any injuries which the minor may have sustained, resulted from his own negligence, whilst trespassing upon defendant’s property. Taking the pleadings and evidence together, the case presented is as follows:
Not long before noon, July 11th, 1899, one of the defendant’s trains, consisting of an engine, baggage car, coach for colored people, coach for white people, arid sleeper, reached Shreveport and pulled into the Union Depot. The passengers and the baggage were soon discharged and the train backed in the direction of certain freight yards in order to be put in readiness to go out, according to schedule, in the afternoon. The defendant company is called the “Cotton Belt”, but, so far as the testimony goes, it appears that it went into Shreveport over the bridge of the Vicksburg, Shreveport & Texas Railroad Company, used the tracks of said company in reaching the depot, and in backing out, and that the freight yards into which it backed, and where it was to remain and be overhauled preparatory to its departure in the afternoon, were the yards of the same company; from which it would seem that the two roads are conducted under one management, or, and beyond any question, that they are working under an arrangement whereby the bridge, the tracks to the depot, and from the depot to the freight yards, as also the depot itself and the freight yards, are used in common.
Just before the train in question backed out of the depot, the boy, about fourteen years old, in whose behalf. the suit is brought, got aboard. He states that his purpose was to mail a letter, but that, not knowing where to mail it, he got off, when the train started, and then, when the train was in motion, seeing the mail box, or opening for letters, in the side of the baggage ear, he got on again, intending to ride to a street crossing, at which a stop was usually made, and avail himself of the opportunity to accomplish his mission. The theory of the defendant is, that his purpose was to steal a ride. There is some evidence cor *1708 roborating the statement of the boy and some corroborating the defendant’s theory.
Pretermitting this question; it will be understood that, in backing, the position of the cars was reversed, and that, as the train was moved, they were in the following order, from front to rear, to-wit; sleeper, white coach, colored coach, baggage car, and engine, so that, accommodating this opinion to the testimony of the.witnesses, who spoke with reference to the manner in which the train was made up, rather than with reference to the direction in which it was going, the expression “rear platform”, and “front platform”, are to be taken in the opposite sense to that in which they would ordinarily be understood, with the engine in front. Bearing this in mind; the boy was on the lower step, either of the front platform of the sleeper, or of the rear platform of the white coach; and, whilst the train was moving at the rate of six or seven miles an hour, he either jumped, fell, or was forcibly ejected, in such a way that his left arm was so mangled under the wheels that amputation at the shoulder was necessary, and was performed, almost immediately.
This being the case, it is immaterial what may have been his reason for getting on the train. If he voluntarily jumped, or, through fault, or misfortune, of his own, fell off, he is not entitled to recover. Upon the other hand, if he was forcibly ejected, by any one for whom the defendant is responsible, he is entitled to recover; no matter why he got on the train, since there is no law authorizing the taking off of a boy’s arm at the shoulder as a penalty for trespassing- on railroad, or any other, property. We have, therefore, to consider the two questions of fact: (1) Did the boy jump, or fall, off; or, was he forcibly ejected? (2) If forcibly ejected, was it by any one for whom the defendant is responsible? There is more or less of conflict in the evidence, but the truth lurks in the midst of the conflict, and, though somewhat obscured, is not beyond the reach of deliberate and impartial investigation.
There are some white witnesses and some colored ones; some who are railroad men, and some who are not, and, without regard to these distinctions, there are some, and this includes the majority, who have stated the facts as they understood them, and to the best of their ability; and others, being a small minority, whose statements are irreconcilable with knowledge in their possession and with their want of knowledge.
*1709 There is no question but that the boy was standing on the lower step of either the sleeper or the white coach, facing outwards; and that, whilst in this position, his feet, either voluntarily, or involuntarily, went out from under him; and that, after hanging and dragging a little, he fell under the car and received the injury of which he complains. His statement is as follows: “When we got in front of Ed. Wafer’s saloon, a white fellow came to the door and said ‘Get off’; I looked around at him and did not pay any attention to him, and I kinder looked again.
“Q. — And he hallowed at you?
“A. — Yes, sir; he said ‘get off here’, and I turned around towards the depot and then he kicked mo; and when he kicked my feet from under me, I held hold of that little tiring by the steps that you pull up with; I held hold of that with my left hand, but the train jerked me and I-had to turn loose, and it rolled over my arm. I was standing on the steps when he kicked.”
Elmore Jackson, Lewis Stephens and Henry Toney were standing in front of the saloon to which the boy refers. Jackson and Stephens testify positively that they saw the man, who is identified as Smith, kick the boy off, and that there was no one else on the platform at the time. Toney testifies that the man rushed and hallooed at him, and made him jump off, and that he did not see him kick the boy, but that he can’t swear that he did not, and thought he was near enough to have kicked him. Wood testifies that he was loading his express wagon and heard exclamations of the by-standers “the man with the white shirt on kicked the boy off.” Jackson also testifies that he went to the boy immediately, put him in a hack, and sent him to his mother, and that the boy said “that man kicked me off.”
The story which Smith tells is; that he has been, for the past ten years, in the employ of the Vicksburg, Shreveport & Texas R. R. and the defendant companies, but that, at the moment of the occurrence, he was unemployed. As we understand him, he had just previously been in the employ of the V., S. & P. Co., and re-entered that service immediately afterwards, so that the time during which he was not so employed was measured by that of the occurrence. He says that he got on the train at the bridge, as it was coming in, because he wanted to see the conductor and ask him how he had been getting on, and that he saw the boy catch on at that point; that, in backing out from the depot, he was standing on the rear platform of the white coach, riding around for *1710 pleasure, while the boy was on the adjacent front platform of the sleeper, and that he neither spoke, nor did anything to him, but that the boy jumped off; that considering the speed of the train at the time anyone used to getting oil trains would not have fallen; and that he remained on the platform after the boy was caught in the wheel, made no attempt to pull him out, and did not know until afterwards that he was hurt. Being asked, “How soon did you leave the train after that accident?” he replied, “I think about two weeks”. At the end of which time it appears that he went to visit his father, in Mississippi, ¡and remained there, until he returned to Shreveport in order to give his testimony. lie further testifies that he had not been in 'the employ of the “Cotton Belt” since 1891, and has chased no boys off its trains, and would not have done so under any circumstances, though he also says that he was employed in the yard, and that all the men there, from car inspector down, have orders to keep trespassers and vagrant boys off the trains. He further says that he had seen the boy, in whose behalf the suit was brought, jumping on and off the trains every day.
There are two witnesses who undertake to testify positively that Smith did not kick the boy; Shanklin and Hutton. Shanklin was at that time in the employ of the V., S. & P. Co., and was going toward the depot, from which the train was coming, on another track, and on the side upon which the boy came off. lie says: “I was a car length below, and had a full view of the rear end of the car, when the boy fell”; and from his further testimony, he places himself somewhere near the end of the sleeper, and from two and a half to five feet from its side. He swears, most positively and emphatically, that there was no one but the boy on the rear platform of the white coach, that the boy was on the steps of that platform," and that he fell off, and was not kicked off. It is shown to our satisfaction that, within a fortnight after the occurrence, this witness stated that he was not in a position to see whether the boy was kicked off or not, and it is evident that there is an irreconcilable conflict between his testimony and that of Smith, who swears that he was standing on the platform, upon which the witness swears that there was no one standing. The other witness, Hutton, claims to have been standing about half way in the rear door of the white coach, with one foot on the platform, and near Smith, who was outside on the platform. He says that the boy was on the steps of the sleeping car platform and beyond Smith’s reach; and that Smith neither spoke to him, nor kicked *1711 him. He also says that the boys are great nuisances, and worry the railroad company’s employes a great deal, and that he, now and then, tells them that they ought to be doing something else than catching on passenger trains. Two other witnesses, Woodward and Russell, testify that they did not see Smith kick the boy, though they saw the exit of the latter, and saw him hang- by the hands, drag, and fall. This testimony is unimportant, except in si far as it corroborates the boy’s story. Woodward was located in the colored coach; and Russell was standing on the lower steps of the front platform of the white coach, and neither could see Smith, who was on the rear platform of the white coach. Their statement that the boy appeared to jump, or step off, throws no light on the question at issue, because anyone so situated, and driven, by force, from the rear, would involuntarily make some effort. Woodward says that he could have seen anybody kick him. This is manifestly untrue. Russell, who was in a better position than Woodward, says he could have seen it, if the boy had been kicked “hard”. He, no doubt, means by that, that, if Smith, in kicking the boy, had brought his own person within range of his, Russel’s, view, i. e,., beyond the line of the car’s side, the witness could have seen it; but that is not to the point. Several other railroad employes were examined, and they agree that the practice of jumping on and off the trains, by colored boys, was a source of great annoyance, and that their instructions were to keep the boys off. One or two of them undertake to identify Craig as one of the offenders. It also appears that there is an ordinance of the city under which the offence can be dealt with. The Chief of Police testifies, that, in July, 1899, when the affair occurred, Smith was a special officer, appointed at the request of the railroad companies and paid by them, and that he was so appointed upon the representation that they needed such a person as watchman at the bridge; because of disturbances on trains; and because of the annoyance to which they were subjected by boys jumping on and off their trains.
Jones, train inspector for the V., S. & P. Co., testifies that Smith had been employed about the yards for several years, and was so employed in the summer of 1899, and that he had seen him chase boys off the trains. And Richler, Walker, and Eants, also testify to having seen Smith so engaged — Walker mentioning the name of a boy who was arrested by Smith in August, 1898, and fined $5.00. When we add to this testimony the eloquent silence of the defendant upon the subject of *1712 Smith’s employment, further comment becomes unnecessary. If he was not employed by it, some respectable and responsible officer would have so testified, as its learned counsel fully appreciated the importance of the question.
We concur in the conclusion reached by the jury, before which the case was tried, and by the judge a quo, who made the verdict the judgment of the court, that the case isi with the plaintiff, and that it has been proven that the boy, in whose behalf the suit was brought, has lost his arm by reason of his having been forcibly, and unlawfully (as to the manner) ejected from a moving train by a person for whose action the defendant is liable.
Cooley on Torts, §§ 532, 538; Burrows on Negligence, 155; Steamboat Co. vs. Brockett, 121 U. S., 637; Hoffman vs. N. Y., Etc., R. R., 87 N. Y., 25; Higgins vs. Watervliet, Etc., R. Co., 46 N. Y., 23; Coleman vs. N. Y., Etc., Co., 106 Mass., 160; Johnson vs. Chicago, Etc., R. Co., 58 Ill., 348; Hart vs. N. O. & C. R. R. Co., 1 R. (La.), 178.
The amount of damages awarded was $4,000, and defendant’s counsel argues that, considering the position, earning capacity, etc., of the person injured, this is excessive.
The boy is poor, black, illegitimate, and ignorant, and, when injured, was receiving seventy-five cents a week for working about a negro barber shop, to which were added his earnings, probably a few dollars a week, as a bootblack. It seems to us that, being thus about as badly situated as a boy of fourteen, who is not an invalid or a criminal, can be, he was particularly in need of the arm of which he has been deprived; for that, and the other arm, were about all that he had to depend upon to help him through, in the long struggle which lies before him, and which is hard enough, even for those who are better situated and have both arms and hands; and that the amount as allowed is not excessive. Ketchum vs. T. & P. Railway Co., 38 Ann., 777; Barnes vs. Railway Co., 47 Ann., 1218; Lampkin vs. R. R. Co., 42 Ann., 997.
The judgment appealed from is therefore affirmed.
Rehearing refused.