## No. 13,454.

## L. J. ARGUIMBAU & CO. VS. GERMANIA INSURANCE COMPANY.

### SYLLABUS.

1. Where suit is brought upon a policy of insurance which has a printed condition, or warranty, attached upon the face of it, and it is claimed by the plaintiff that such condition, or warranty, was eliminated when the contract was made, by reason of a verbal statement of the agent of the company to the effect that the company would give no trouble about it; but the condition was, nevertheless, allowed to remain in the contract, to the knowledge of the assured, who fully understood its meaning and legitimate effect, testimony going to show such verbal statement should be excluded on the objection that it tends to vary and contradict a written instrument.

2. It is not a question, in such a case, of the authority of the agent, but a question of the right of a party to a contract, which has been reduced to writing, without attempting to reform such contract and without charging error or fraud, to substitute in place thereof a verbal agreement of which the written contract, with some of its provisions eliminated, is said to be a part.

3. The secretary of an insurance company cannot bind the company for a loss which has occurred, but for which the company is not otherwise liable.

PPEAL from the Civil District Court, Parish of Orleans— *King,* J.

*John C. Wickliffe* and *Rose C. Falls,* for Plaintiffs, Appellants.

*Buck, Walshe & Buck, (Edward M. Hudson,* of Counsel,) for Defendant, Appellee.

### STATEMENT OF THE CASE.

The opinion of the court was delivered by

MONROE, J. Plaintiffs shipped certain cattle and hogs to Havana, and, by reason of stormy weather, many of them were lost, and others were injured, on the voyage. They bring this suit to recover, under a contract of insurance, the value of the stock so lost and injured, together with the freight paid, and certain damages alleged to have been sustained by reason of the non-payment of the claim; and they allege: "That, on the 3rd day of December, 1898, they insured said hogs and cattle * * * in the Germania Insurance Company * * * through B. W. Sewall, an agent of said company, as evidenced by the certificates of insurance of same hereto attached and made part hereof, marked 'B.' That they paid, as premium for said insurance, the sum of forty-four dollars and sixty-eight cents, as evidenced by the receipt of said B. W. Sewall, agent of said company, therefor, hereto attached and made part hereof, marked 'C.' That after paying the said premium, and the departure of the messenger bringing said certificate, they read the certificate, and noticing the type written slip attached thereto, they immediately wrote, and mailed, to the said B. W. Sewall, agent, a letter, refusing to receive said certificate with the limitation imposed by said type-written slip, and demanded the usual, regular, marine policy, against the dangers of the sea. * * * That, upon the morning of December 4th, 1898, Alfred Isaacson, one of your petitioners, met said B. W. Sewall, agent of the said company, and inquired whether he had received said letter, and renewed, verbally, the protest against the type-written clause, and the refusal of your petitioners to receive said certificate of insurance with the limitations therein contained, and again demanded a policy with the usual marine risk. That said B. W. Sewall, agent of the said company, speaking and acting for said company, then and there agreed to, and accepted, in behalf of said company, said protest, and assured your petitioners that 'it would be all right; that such a clause was usual—it meant nothing; and that there would never be raised any question about it, by said company, if there should be a loss,' with other and like

statements, which were calculated to lead your petitioners to believe, and were intended to make them believe, and did lead them to believe, that said type-written clause was a mere formality and was waived by said company; and that the certificate of insurance above referred to was one covering the ordinary and usual marine risks, and protected your petitioners as recited upon its face without said type-written clause."

Then follow allegations concerning the value of the stock and the circumstances of the loss, etc.

The certificate of insurance upon which the suit is based, and which is annexed to, and made part of, the petition, is as follows, to-wit:

### "*Certificate of Insurance.*

"This is to certify that the Germania Insurance Company, of New Orleans, La., hereby insures L. J. Arguimbau & Co., under and subject to all the conditions of policy No. ———— in the sum of $8000; on live stock, $6875.00; on freight, $1125.00, whilst contained in S. S. Miguel Jover, from New Orleans to Havana, for the term of voyage, from the 2nd day of December, 1898, to the ———— day of ————, 189—, at twelve o'clock, noon; loss, if any, payable to assured, or order, hereon, on return of this certificate. In testimony whereof, the company has caused these presents to be signed, this 3rd day of November, 1898.

(Signed)   "O. T. Maier, *Secretary."*

The "*type-written slip,*" referred to in the petition, is attached to the face of this certificate, and reads:

"Warranted by the assured that claims under this policy shall only be made for total loss; no claim will be allowed (*sic*) for animals killed or disabled by reason of storms or shipping of seas.

(Signed)   "O. T. Maier, *Secretary."*

The defendant admits the contract as set forth, but denies the alleged modification, and denies that B. W. Sewall was its agent, or that he was authorized to make any concession or waiver in its behalf. And it alleges that, on the contrary, he was an insurance broker, the extent and limitation of whose authority was well known to the plaintiffs, etc. An exception of "no cause of action" was maintained by the lower court as to the claim for damages alleged to have been sustained by reason of the failure of the defendant to make prompt settlement, and that part of the claim is abandoned.

The only witnesses examined in the case were Alfred Isaacson and
L. J. Arguimbau, members of the plaintiff firm, and Otto Maier, the
secretary of the defendant company. B. W. Sewall, through whom the
insurance was effected, was not called or examined as a witness by
either side.

Arguimbau testifies only as to the handling of the stock between
here and Havana and the injury and loss sustained. Isaacson, alone,
for the plaintiffs, testifies as to the contract. He states that B. W.
Sewall, through whom his business with the defendant was transacted,
is his nephew, and, whilst he does not tell us, specifically, how the par-
ticular contract in question was made, he makes the following general
statement, which, we assume, applies to the instant case, to-wit: "We
would do it in this way—my office is at the stock landing, some four
or five miles from the city, and my nephew has an office up town, and
when we found that we were going to make a shipment, I would write
a letter to him, asking him to place so much insurance with his com-
pany, telling how much on cattle, etc., and when the vessel would sail,
and he would send down the certificate and his bill."

It further appears, from the testimony of this witness, that the live
stock in question was shipped on board the S. S. Miguel Jover on
December 2nd, and that on December 3rd, 1898, Mr. Ledbetter, a mes-
senger from Mr. Sewall's office, delivered to the witness the certificate
of insurance here sued on, with Sewall's bill for the premium; that the
witness noticed the type-written slip attached upon the face of the
certificate, and sent, by Ledbetter, a verbal message of objection con-
cerning it to Sewall, and that he also and at the same time, sent, by
Ledbetter, a check for the premium; but that he retained, and has con-
tinued to retain, the certificate, with the slip attached, in his possession.
It also appears from his testimony that upon the same evening he
wrote, and mailed, a letter to Sewell as follows, to-wit:

"December 3, 1898.

"*B. W. Sewell, Agent, Germania Ins. Co.—*

"DEAR SIR—Your certificate received, and is not satisfactory. I
want your policy to be a regular marine one, against the dangers of the
sea, like any other freight. If the cattle die or hurt one another that
is another thing, but if a storm should occur and cattle are killed, or
lost, by same, we expect pay for it, so arrange shipment that way."

Upon the following day, which was Sunday, the witness casually
met Sewell at the postoffice, and gives the following testimony as to

what occurred, to-wit: "I met him by accident at the postoffice and attacked him about sending me another one of those slips on his certificate, and he said to me, 'Uncle Alf, they put those slips on all those kind of policies—and that no question would be raised in regard to it, do not bother about that'—something to that effect; * * * he told me I would never have any trouble with the company." After the loss, it appears that the witness and his partner went to the office of the company and had some conversation with Maier, the secretary, which was excluded on the objection of defendant's counsel. We will, however, refer to this hereafter.

The evidence shows that Sewall was the agent of the defendant company in New Orleans, where it has, also, its main office and domicile, from the latter part of 1896 until May 31st, 1898, after which his relation was that of solicitor. As agent, he was furnished with forms of fire policies bearing the signature of the president and secretary of the company and he was authorized to receive proposals for insurance, "against loss or damage by fire;" to make insurance by means of said policies; to renew the same; to authorize the assignment thereof, and "to vary the risk according to the rules and instructions" received by him from the company. He was not designated "general agent," in the commission which was issued to him, and he was not authorized to effect marine insurance of any description.

The plaintiffs show that they obtained, through said Sewell, prior to May 31st, 1898, and whilst he actually held a commission as agent of said company, for themselves and others, considerable fire insurance, and they offered in evidence more than twenty policies which had been issued prior to said date, and some of which were in force upon December 3rd, 1898, when the certificate sued on was issued. The purpose of this offer being to show that they had known him to be the agent of the company, had dealt with him as such, and, at the time of the issuance of the certificate sued on, and of his alleged verbal stipulation with respect thereto, held contracts signed by him, in that capacity; and hence, not having been informed that his commission as agent had been withdrawn, that they were justified in believing that he still held such commission, and, holding it, that he was authorized to bind the company in the manner in which they claim that the company has been bound.

The policies thus offered are all signed by the president of the company and by the secretary, and are countersigned, "B. W. Sewell,

general agent." Upon the face of each of them, in bold type, is printed the following, among other conditions, to wit: " * * * No officer, agent, or other representative of the company shall have power to waive any provision or condition of this policy except such as, by the terms of the policy, may be the subject of agreement indorsed hereon, or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have power, or be deemed, or held. to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto; nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the waiver unless so written or attached. * * * This policy shall not be valid unless countersigned by the duly authorized agent of the company at New Orleans." Upon the back of each of them, in a space provided for that purpose, is a conspicuous "paster" bearing the legend:

"Insurance."

"B. W. Sewell, Jr."

"607 Hennen Bldg."

"New Orleans."

Several bills for premiums, which we find in the record, some bearing date before, and some after, May 31, 1898, are made in the name of "B. W. Sewell, Jr., general insurance agency, 607 Hennen Building," and we conclude that Mr. Sewell was doing a general insurance agency business, as well whilst he was the agent of the defendant as afterwards. At the date of the trial, however, in December, 1899, he had given up the insurance business entirely, and was otherwise employed. It is further shown that the plaintiffs had previously obtained from the defendant, through Mr. Sewell, at least four certificates of marine insurance on live stock and that they all, with the exception of the second one issued, had the type-written slips attached, and were otherwise identically the same as the certificates here sued on; said certificates, as also the certificate sued on, bearing the signature of the secretary of the company, but none of them bearing the signature of Mr. Sewell. It further appears from the record that, by reason of bad weather, a number of the cattle and hogs insured were killed, and others were crippled, on the voyage, but that the ship reached port and a considerable portion of the consignment was landed in Havana and sold, so that there was not a total loss.

Arguimbau & Co. vs. Insurance Co.

## OPINION.

It is not disputed that unless the plaintiffs can, in some way, eliminate the stipulation, or condition, upon the type-written slip from the contract upon which they sue they have no case. Upon the subject of their attitude with respect to the said slip there is a marked failure of correspondence between their *probata* and their *allegata*. They allege, in substance, that they did not notice the slip, did not read it, and were not apprised of its meaning, until after they had paid the premium to the messenger by whom the certificate was delivered, and he had taken his departure from their office. Upon the other hand, Mr. Isaacson, to whom the certificate, with the slip attached, was delivered, states in his testimony that he recognized the presence, and the significance, of the slip before the messenger who delivered the certificate left his office, and that, whilst he gave the messenger a check for the amount of the premium, he also charged him with a verbal message to Mr. Sewell in the nature of an objection to said slip. But, and here the averments of the petition and the proof offered to sustain them again fail to connect. Mr. Isaacson did not charge the messenger with the return of the certificate and of the objectionable slip. It is alleged in the petition, in substance, that the plaintiffs, by means of a letter to B. W. Sewell, agent, upon the evening of December 3rd, 1898, refused to receive the certificate with the limitation imposed by said type-written slip; but the fact is, the "certificate with the limitation imposed" had actually been received by Isaacson from the hands of Sewell's messenger before the letter to Sewell was written, and Isaacson, knowing all that there was to be known concerning said certificate, and, nevertheless, retaining it in his possession, had given his firm's check for the premium called for by it. We find this course of conduct irreconcilable with the verbal and written protests upon which the plaintiffs rely, and we can readily sympathize with the error into which the plaintiffs' counsel appear to have fallen in drawing their petition, since it is difficult to understand why a business man should retain a certificate of insurance and pay the premium thereon, and, at the same time, repudiate the contract represented by such certificate; and it is equally difficult to understand what is meant, when, after having received and paid for it, and whilst still holding it in his possession, and with no offer to return or surrender it, such person writes a letter *"refusing to receive"* such certificate.

Taking the situation as the plaintiffs have presented it, the question arises, whether they are to be held as having accepted the contract tendered them, by reason of their having paid the premium as called for, and their retention of the certificate; or, whether they should be considered to have rejected and declined such contract, by reason either of the verbal message sent through the collector of the insurance agent, or of the letter written to such agent. The live stock, it will be remembered, were shipped on December 2nd and the certificate was delivered during the afternoon of December 3rd, whilst the letter was not written until later in the evening. Let us suppose that in the meantime a loss had occurred within the meaning of the type-written slip, is it not likely that the plaintiffs would have claimed that, by retaining the certificate and paying the premium, they had entitled themselves to recovery? But, if plaintiffs' present position be tenable, then there was no contract (notwithstanding their retention of the certificate and their payment of premium), up to Sunday morning, December 4th, when Isaacson accidentally met Sewell at the postoffice; and whatever contract there is is the result of the conversation which took place between those two gentlemen at that time. The evidence shows, however, that the meeting was accidental and that Isaacson had not expected to see Sewell until the following day, Monday; so that, from Friday, the 2nd, until Monday, the 5th, according to the theory now propounded, Mr. Isaacson did not expect that there should have been any insurance, and the S. S. Miguel Jover, with the uninsured live stock on board was in the meantime expected to have been well on its way to Havana and might easily have been at rest, forever, beneath the waters of the Gulf of Mexico. But, taking it as we have it, and assuming that there was no contract whatever, Mr. Isaacson met Mr. Sewell, by accident, at the postoffice, on Sunday morning, and attacked him about sending him "another one of those slips," that is to say about sending him a written instrument purporting to insure valuable property for a consideration, to the conditions of which Mr. Isaacson objected, and thereupon Mr. Sewell said, in substance: Uncle Alf, they put those slips on all those kinds of policies; no question will be raised in regard to it; do not bother about that, you will never have any trouble with the company." And the contract, theretofore dormant, or non-existent, is supposed to have been vitalized at this point and by this language, taken in connection with the apparently silent acquiescence of Isaacson. But it is evident that the language used is insuffi-

cient, by itself, to bind anyone, since neither insurance, nor live stock, nor premiums, nor obligations of any kind are mentioned, and still less specified. We must, therefore, in order that it should .subserve any useful purpose, hold that such language gives effect to certain provisions of the written instrument to which it refers, to the exclusion of the remaining, and equally important, provisions; and, the whole instrument being made the basis of this suit and being annexed to and made part of the petition herein filed, we must ascertain its meaning, not from the instrument itself, but from this conversation, which took place concerning it, and which is said to have given it whatever effect it may have. It is said that the conversation whilst giving the effect of a contract to one part of the instrument eliminates certain provisions affecting the character of the risk. But if we are to determine from the conversation, and not from the writing, whether the defendant insured against injury and partial loss as well as against total loss, we might also determine from the conversation whether there were two hundred head of cattle insured or two thousand; whether they were insured for a voyage to Havana on the steamship Miguel Jover, or for a voyage to Liverpool on the brigantine "White Wings;" and whether the premium was forty dollars or four hundred dollars; and we should find ourselves preferring the contemporaneous verbal version of a contract which the parties had seen fit, *for greater certainty,* to reduce to writing. It will be observed that this is not a case where the parties to a contract, after it had been made and reduced to writing, became dissatisfied with certain of its conditions and, by a new contract, agreed to abrogate or waive them. The proposition here is that there was a contract, but that the written instrument which was agreed upon as evidence thereof, and which is declared upon as expressing such contract, contains stipulations which the parties have always known were there, which they have always known did not express their meaning, but which, from the beginning, were allowed to remain conspicuously in such written instrument, with the verbal agreement that they should not be held to mean what the language used plainly imports.

The plaintiffs cannot, and do not, pretend that they did not know the meaning and intended effect of the type-written slip. They had, on a former occasion, received a certificate with such a slip attached, and had objected to it. It is said that, as a consequence of this objection, they, on the next occasion, were furnished with a certificate without the slip. But it is conceded that, upon two still later occasions, they

received certificates with the slips attached. Moreover, this particular case arises out of the fact that the plaintiffs knew what the language of the slip was and objected to it because they knew; and yet, notwithstanding this, and notwithstanding the fact that they do not, and cannot, allege either fraud or error with respect to its presence in the instrument upon which they sue, they ask this court to consider that language as unwritten or to hold that it has no meaning, upon the ground that it was verbally agreed between their Mr. Isaacson and the defendant's agent, Mr. Sewell, when the contract was made, that it should be so considered, or held, and that the written instrument in which it was allowed to remain should be construed as though it had been eliminated therefrom. This position we think untenable, under the law and jurisprudence of this State. It is true that, in a proper case, it is unnecessary to resort to a separate action to reform a contract of insurance, the courts of this State having jurisdiction to reform such a contract, and to grant further relief in the same proceeding. Lippincott vs. Insurance Co., 3rd La. 546. But it is plainly a condition precedent to the further relief which the plaintiffs are seeking, that the contract upon which they sue should be reformed, since, upon their own showing, they are entitled to nothing under it, in its present shape. They are not, however, in a position to allege, and still less to prove, the facts which would be necessary to entitle them to reform the contract in question, and the parol evidence, offered for the purpose of establishing, in its place, a contemporaneous verbal contract, was open to the objection, which was made, and should have been sustained, that it varies and contradicts a written instrument.

"A policy of insurance may be reformed, where it is demonstrated, by legal and exact evidence, that there has been a mistake in filling it, which has violated the understanding of both parties." Davega vs. Ins. Co., 7 Ann. 228.

"When a policy of insurance, as issued, does not conform to the contract which it purports to evidence, and the assured accepts the policy in the belief that it does conform to his contract, a court of equity will reform the written instrument."

\*          \*          \*          \*          \*          \*          \*          \*

"The want of conformity must be occasioned by a mistake which is mutual and common to both parties to the instrument. A mistake on one side may be a ground for rescinding, but not for reforming the

contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified."

\*        \*        \*        \*        \*        \*        \*        \*

"It is not sufficient that the plaintiff should prove this by a preponderance of evidence, but he must establish the fact by such evidence as to show conclusively that a mistake had been made, and to satisfy the court and the jury of such mistake beyond a reasonable doubt."

A. & E. Ency. of Law, 2nd Ed., Vol. 16, pp. 869, 870.

The plaintiffs in this case do not allege that there was any misunderstanding or mistake as to what the contract upon which they sue was to contain, nor do they allege that anything was left out that they expected would be put in, or was put in, that they expected would be left out. Their whole case lies in the proposition that there was a contemporaneous verbal contract, which not only varied, but, practically, superseded, the written contract into which they entered, and upon which they sue. This, however, they are not entitled to prove over the defendant's objection. "As, in case of other written contracts, parol evidence is inadmissible to vary or contradict a written policy or contract of insurance."

A. & E. Ency. of Law, 2nd Ed., Vol. 16, p. 966.

Courtney *et als.* vs. Ins. Co., 12 La. 233

Bell vs. Ins. Co., 5 R. 423.

Woodruff vs. Ins. Co., 5 Ann. 697.

Trager vs. Ins. Co., 31 Ann. 235. .

Gomilla vs. Ins. Co., 40 Ann. 553.

Weinberger vs. Ins. Co., 41 Ann. 31.

This view throws the question of the extent of Sewell's authority into the background, as a matter of little consequence. We think, however, that the evidence which the plaintiffs themselves have offered, that is to say, the policies produced by them, shows that they knew, or were in a position to know, that Sewell was without authority to waive any of the provisions of a fire policy except by writing indorsed upon, or attached to, such policy. And there was nothing to have led them to believe that he had any greater authority in the matter of marine insurance. Upon the contrary, it must have been within their knowledge that, whilst he signed fire policies as general agent of the company, his name did not appear upon the certificates of marine insurance at all.

It is claimed that if certain testimony which plaintiffs endeavored

to get before the judge had not been improperly excluded, the plaintiffs would have shown that the defendant had knowledge of the fact that Sewell had agreed to the ignoring of the type-written slip, and that, after the loss, with knowledge of all the facts, the officers of the company were ready to settle.

The three bills of exception relied on in this connection show that the plaintiffs' counsel excepted to the ruling of the trial court in excluding testimony to prove that Maier, the secretary of the company, after the loss, told plaintiffs "to go and see Noll, of the Teutonia, and see what they" (the Teutonia Insurance Co.) "would do; that they, the Germania, only had part of the risk, having reinsured most of it, but would only be too glad to pay their part."

Assuming that plaintiffs could have proved that Maier made this statement, we do not think that it would make the company of which he is secretary liable for a loss which had already occurred, and for which it was not liable upon any other ground. To hold otherwise would be to hold that the money of an insurance company is at the disposal of the secretary, to be disbursed as he pleases, and without regard to whether claims presented are just or unjust.

Other exceptions which we find in the record it is unnecessary to pass upon.

Judgment affirmed.

Rehearing refused.