ROUSSEAU v. TEXAS & PACIFIC ET AL.

---

(August 2, 1926, Opinion and Decree.)

---

(*Syllabus by the Court*)

1. Louisiana Digest—Master and Servant —Par. 164.

The master is liable in damages for any negligence or illegal act committed by his servant in connection with, or in furtherance of, the purposes for which the servant is employed.

2. Louisiana Digest—Evidence—Par. 55.

Where one of the parties to a suit has more means of knowledge concerning

a matter to be proved than the other the burden of proof is upon him.

3. Louisiana Digest—Evidence—Par. 40, 42.

Where a defendant fails to produce as a witness his servant charged with the commission of an illegal act the presumption is that the servant would not deny it.

4. Louisiana Digest—Death by Wrongful Act—Par. 17, 18.

A judgment for $6000 in favor of father and mother claiming damages for the malicious killing of their son 26 years of age deemed a reasonable amount of damages for suffering of the deceased, loss of his society, and deprivation of his support.

Appeal from the Twenty-fourth Judicial District Court for the Parish of St. Charles, Hon. L. Robert Rivarde, Judge.

Action by Theodule Rousseau and wife against The Texas & Pacific Railway Company and Missouri Pacific Railroad Company.

The was judgment for plaintiffs and defendants appealed.

Judgment amended and affirmed.

Robert J. Perkins, of New Orleans, attorney for plaintiffs, appellees.

Hudson, Potts, Bernstein, Sholars, of Monroe, and John E. Fleury and Spencer, Gidiere, Phelps and Dunbar, of New Orleans, attorneys for defendants, appellants.

CLAIBORNE, J.   This is a suit by the father and mother for damages for the malicious shooting and killing of their son in the Parish of St. Charles by an alleged employee of the defendants. The plaintiffs are colored people.

The petition and supplemental petition alleged that Ursin Rousseau was one of the children of plaintiffs; that on March 5, 1921, he was twenty-nine years of age; that on the night of that day at about 11 o'clock at Luling, La., he was maliciously and without cause, shot in the back by a railroad detective in the employ of defendants and at the time in the discharge of the duties incident to his employment; that he was taken to the home of petitioners and there attended by a physician; that upon the advice of said physician, their said son was put into an automobile and carried to the Charity Hospital in New Orleans where he died in great suffering the next morning at eight o'clock; that his body was brought back to the Parish of St. Charles and there buried; that at the time of his death he was earning $2.25 per day; that he contributed to petitioners' support and every pay-day gave petitioners about three-fourths of his wages. The plaintiffs claim:

| | | |
|---|---|---|
| 1st  Damages for suffering on account of the loss of their son | $12,000.00 | |
| 2nd  Damages for loss of support of their son | 12,000.00 | |
| 3rd   Doctor's fees | $   5.00 | |
|       Undertaker | 106.00 | |
|       Shipping body | 4.00 | |
|       Burial | 17.00 | |
| | | 132.00 |
|       Suffering by their son | | 5,868.00 |
| Total | | $30,000.00 |

The Texas & Pacific exception to the jurisdiction of the court ratione personae and materiae, and that the petition disclosed no cause of action, without disclosing why in either case.

The Missouri Pacific excepted that the citation served upon it at Monroe, more than 100 miles from the Parish of St. Charles, did not state the exact distance and was an absolute nullity, it not containing the correct stipulation as to the time allowed it to appear and answer, although the citation did state that one day more was allowed for every ten miles

that its residence was distant from the St. Charles Parish court house.

The attorney for the railroad certified "that the above and foregoing exception was filed in good faith and not solely for delay".

The Texas & Pacific Railway denied each allegation of plaintiffs' petition.

The answer is sworn to by its attorney as "true and correct".

In answer to the supplemental petition the same Texas & Pacific Railway answered: "In the alternative, and in the alternative only, in the event that it be shown that the plaintiffs' son was shot as and in the manner alleged in plaintiffs' petition and his death ensued therefrom by any person riding at the time on one of the trains of this respondent and in the employ of this respondent or the joint employ of this respondent and any other railroad or carrier, that then and in that event, and in the alternative only, respondent shows that the act of such person in shooting plaintiffs' son was without the scope of the employment of such person and was an act for which this respondent was in no wise responsible".

The Missouri Pacific Railroad, denied each and every allegation of plaintiffs' original and supplemental petitions and reiterated the answer copied above of the Texas & Pacific to the supplemental petition.

On October 30, 1923, the Texas & Pacific Railway filed a supplemental answer in which it alleged, "that on March 1, 1920, the possession, operation and control of said line of railroad and of all its property was resumed by the said court for the western district of Louisiana through the receivers appointed by said court, to-wit: J. L. Lancaster and Charles L. Wallace, and from the expiration of Federal control until the present time, said road has been operated exclusively by said receivers".

In a supplemental answer filed on the day of trial the Missouri Pacific Railroad, alleged that if the court should find that the plaintiffs' son was shot by any person in its employ then it averred "that the shooting and subsequent death of Ursin Rousseau, plaintiffs' son, was due solely and entirely to the fault and actions of the said Ursin Rousseau which contributed to his shooting and subsequent death".

All these answers are signed by attorneys of the defendants.

There was judgment rendered November 24, 1924, in favor of plaintiffs and against both the defendants in solido for $3000.00.

The defendants have appealed.

The plaintiffs joined in the appeal and prayed for an increase of the judgment to $30,000.00.

The transcript in this case is composed of 92 documents, over 200 pages of testimony, over 100 pages of briefs and citation of authorities that would fill a book case, and comes before us for the third time.

The judgment against the Texas & Pacific Railway is clearly erroneous.

The record contains an order dated December 1, 1919, appointing J. L. Lancaster and Charles L. Wallace receivers of the Texas & Pacific Railway Company by the United States District Court for the Eastern District of Louisiana.

In the case of Harris vs. Texas & Pacific Railway, 2 La. App. 501, the court sustained an exception of no cause of action "because the railway company being in the hands of the receivers cannot be held lia-

ble for the negligent acts of the receivers or their agents", supporting their opinion by many authorities.

The marriage of the plaintiffs is established by abundant documentary and parol evidence as well as their parentage of Ursin Rousseau, alias Sambo.

The death of Ursin as a fact is also established by parol evidence and documentary evidence. The coroner's inquest held on March 8, 1921, at Luling in the Parish of St. Charles reads as follows:

"Before me, Victor Lehmann, M. D., coroner for the said Parish of St. Charles, on the view of the body of Urbin Rousseau there lying dead.

"The jurors, whose names are hereunto subscribed, having been sworn to inquire on behalf of the state, upon their oath, do say, that: Ursin Rousseau came to his death as the result of a gun shot wound by a bullet from a gun or pistol in the hands of one H. T. Prudhomme, at Luling, La., at or about 10:30 p. m., on March 5, 1921, said bullet after penetrating the left side of the throat making its exit to the left side along or close to the spinal column. In testimony thereof, the coroner and the jurors of this inquest have hereunto subscribed their names, the day and year above stated. Signed Jury, U. Mongrue, Arnold Horn, Alfred Kinlair, Milo Lorio, Paul Friderick.

"V. Lehmann, M. D., Coroner."

Also the certificate of death of the acting coroner for the Parish of St. Charles, E. J. de Bergne of Ursin Rousseau's cause of death: gun shot wound of abdomen. Homicide. Also the permit of John Callan, M. D., superintendent of Public Health for the removal for burial at Luling of the body of Ursin Rousseau. Cause of death: gunshot wound of abdomen. Homicide. Also certificate of death from Charity Hospital of Ursin Rousseau. Gunshot wound of abdomen. Also the testimony of James Johnson and of both plaintiffs.

The cause of death is also proven beyond question.

B. A. Prickett was the conductor of the through freight train No. 59 for the Missouri Pacific on the night of the accident, he was in a caboose when he first heard of the shooting; he was told about it by an operator; there was a guard on the train, whose name he does not remember; he had heard of the name of Prudhomme, but had never met him before; this was his first trip on his train as a railroad detective; Ama Tank or Davis is the station just below Luling about a mile and three-quarters; the guard left the caboose at the Davis water tank and went towards the head end but continued on the train; the first stop above Luling is Killona, the message that he received was that a man had been shot at Luling by some one on the train; he made no report of the shooting. The duties of the guard were "to keep people from robbing the cars"; the two brakemen were Gallup and Keith; Prudhomme and Burrows were in court on the day of the trial; as a usual thing there are a good many tramps on freight trains; it is not an unusual thing to hear shooting from or about freight trains through the night, besides the guard there was a detective on the train.

There was objection made by defendants to the introduction of this testimony taken under commission upon the ground that the notary on suggestion of the witness had made corrections to it in writing outside of the presence of defendants after the testimony had been typewritten. The corrections were in the handwriting of the notary. For the reasons we have concluded to disregard the alterations or additions in writing and to consider only that part of the testimony in typewriting.

The additions were not sufficient to exclude the whole testimony.

James Johnson testified that he lives at Luling; he remembers the night Ursin or Sambo was shot; he had been with Ursin at church; it let out at 10 p. m.; after church he went over to the fruit stand on the river side of the track; he was standing there with a bag of apples and oranges in his hand, when he saw the train coming; he delayed until it passed; he said: "during the time the train was passing I saw a flash, you know, and after I saw the flash I heard the report from the gun. I couldn't tell whether it was a shotgun or what, but I saw a flash, and heard a report".

"Q. Yes, about how many feet?
"A. About sixty feet: that is what I take it to be.
"Q. You think the car from which you saw a flash was about sixty feet west of the T. & P. station?
"A. Yes, sir.
"Q. How long after you saw this flash and heard this report, did you learn that Rousseau had been shot?
"A. About three or four minutes after the train passed; just about three or four minutes."

The train did not stop at Luling, it passed at a rate of 15 miles an hour.

Ursin was taken from Luling to Gretna in an automobile, they got there at six o'clock in the morning; from Gretna he was carried over on the ferry to New Orleans, there taken to the Charity Hospital in an ambulance; he died at eight o'clock of the same morning; witness was with him all the time.

William Lassan is parish treasurer, 60 years old, to the "manor born"; he has known Theodule Rousseau "all his days"; he knows the church Johnson testified about and Rousseau's house.

Rousseau's house faces the Texas & Pacific station; in order to get from the church to the station one must walk either in the center of the railroad track or on the side of it, there is no other way; Ursin lived with his father.

M. J. Poirrer is a telegraph operator employed by the Texas & Pacific at Luling, some colored fellow told him about the shooting; he must have reported to the dispatcher, what they claimed had happened, that this negro got shot by the train crew; he could not say whether the train stopped at Luling or not, but the records should say, and they should be in the station; the schedule time for arrival of train 59 or 361 at Luling was 10:35 p. m.

Leon C. Vial, sheriff for the Parish of St. Charles, says that he got information of the shooting of Rousseau and that he made an investigation; he knows Prudhomme and Barrows; he dealt with Barrows as a representative of the railroads; during the month of March, 1921, Prudhomme called on him in company with Mr. Burrows and Judge Fleury to find out whether there was a charge made against Prudhomme; he informed them that there was none, but that one would be made; he had had previous dealings with Burrows as representative of the railroad; he saw Prudhomme some time after, while the grand jury was investigating the matter; no charge was ever made against any one but Prudhomme; the grand jury investigated this case against Prudhomme and found not a true bill.

The judge admitted the testimony of Vial that Prudhomme admitted to him that he had shot Ursin. This was error. Merchants and Farmers Bank vs. Fisher Lbr. Co., 136 La. 859, 67 South. 932; Toca vs. Rojas, 152 La. 320, 93 South. 108.

Dr. L. T. Donaldson testified that he attended Rousseau; that he was suffering from a gunshot wound in the abdomen,

that the bullet entered the right side over the liver, through the stomach, and passed out the left side, he was vomiting blood.

Dr. Victor Lehmann, coroner for St. Charles Parish for the last 34 years, held an inquest over the body of Ursin Rousseau at Luling.

Theodule Rousseau, father of Ursin, testified that Ursin at the time of his death, was 29 years of age; he was not married and had always lived with him and his mother.

The declarations of Ursin as to how he was wounded when, and by whom were objected to as not forming part of the resgestae.

The objections were sustained. Rousseau and his wife are about 55 years old.

Elizabeth Rousseau, mother of Ursin, testified that he lived with his father and mother; that he worked and brought his wages home and gave her $12 or $14 a week and sometimes more; he earned $1.75 to $2.50 per day; when he came home at night he had been shot; the bullet came in one side and came out by the other side.

Joe Dennis is 26 years of age. He met Ursin Rousseau on the night of the killing; they went together to church at eight o'clock; they left the church at about ten o'clock and went together to the house of witness' grandfather, right back of the church about half an acre from the track. They stayed there about twenty minutes, witness then went to his house about sixty feet from his grandfather's house; Ursin left to go to his house; he had to cross the railroad track and walk along the track in order to get there; that was the only way he could get home. Witness heard one pistol shot, and after that he heard Ursin's mother crying; he knew

Ursin's mother well; he then went over to Ursin's mother's house; he also crossed over the ramp and walked down the railroad track; it was about five minutes after he left Ursin that he heard the shot. When he reached the track he saw the tail end of the train, the caboose, going west towards Ashton. When he got over to Rousseau's house, Ursin was lying in bed, he went with Ursin to the Gretna ferry; they left Luling a little after two and got to Gretna at about six; the truck had a bad tire and they were driving slowly. It is about half an acre from his grandfather's house to the track and one acre from the track to Rousseau's house.

F. G. Hudson, Jr., attorney for one of the defendants, was called as a witness by the plaintiffs. He was asked whether H. T. Prudhomme had been in the court throughout the whole of the day and yesterday, whether he had requested Prudhomme to be present at the trial, or whether he had at present in the court room the engineer, fireman and conductor, and one or more brakemen employed on train called No. 59 which passed Luling on the night of March 5, 1921; to all of which questions the defendants objected and were sustained by the court. He was asked whether or not Prudhomme was employed by the defendants at the present time, and he answered: "He is not, so I understand. I don't really know that of my own knowledge."

Dr. Lehmann was also asked if Prudhomme was in the court room; this question was objected to and the objection maintained.

Mr. Fleury, attorney for the defendants, admitted having called on Sheriff Vial with Burrows and Prudhomme. He refused to say more on the ground of privileged communication.

The defendants offered in evidence a certified copy of the order of the United States Court appointing receivers for the Texas & Pacific Railroad dated February 23, 1921. The defendants then rested.

They offered no document and produced no witness.

The testimony of James Johnson and other corroborative evidence establish with sufficient certainty that the shot that killed Ursin issued from the freight train of the Missouri Pacific Railroad Company running through Luling; as it was a freight train there were none but employees of the defendant upon it and the conclusion is irresistible that it was one of them who fired the shot. Upon that train there was one guard, one detective, and brakemen and no passengers. In the case of Simmons vs. Southern Rifle Club, 52 A. 1114, the defendant was held liable for an injury inflicted upon a child by a rifle ball. When it was shown that the defendants had been firing and that there was no other firing going on in the neighborhood, it carried with it the conviction that the bullet by which the child was struck came from the rifle of one of those who alone had been firing".

In the case of Lazarus vs. Freidricks, 125 La. 619, 51 South. 663, the court said:

"Where the testimony of the two parties to an alleged contract conflicts and there are no other competent witnesses, and the preponderance of corroborating circumstances and probabilities sustain the defense, the demand of the plaintiff must be rejected."

And in Castille vs. Cormier, 144 La. 640, 81 South. 210:

"While it does not follow, because a fire occurs after an engine has passed, that the one happening is necessarily the consequence of the other, yet, where a fire occurs the ignition of which is explicable by the proximity of an engine, capable, through negligence, of emitting sparks and cinders, and upon no other theory, which finds any support in the facts, it is unnecessary, in order to entitle the owner of the burned property to recover, that he should have followed the sparks or cinders from the engine to the property and watched the progress of ignition.".

"Where evidence is not conclusive but leaves no other hypothesis it will be considered sufficient." 10 Orl. App. 284; 13 id. 374, No. 7784 id.

In the case of Hart vs. Rrd., 1 Robinson 180, which was a damage suit against the defendants as owners of an omnibus, the court said:

"It was not necessary that the plaintiff should prove a legal title to the omnibus in the defendant, but only to make out a prima facie right; and it would then rest with them to show, what would not be very difficult in a case of this kind, that the omnibus belonged to some other corporation, company or individual."

In the case of Phelps vs. Hughes, 1 La. Ann. 322, the court said:

"Where the issue is whether there was ever such a person as A it is enough for defendants to offer such evidence as, in the absence of counter evidence, will afford ground to believe that no such person ever existed. If such person ever existed plaintiff might have easily proved the fact.

"As to whether the store was exclusively kept to supply the employees and was not to sell to all comers, the onus was shifted by evidence strong enough to establish a prima facie case against the defendants." Lehmann & Co. vs. Knapp, 48 La. Ann. 1148, 20 South. 674.

In the case of Hollins vs. Rrd., 119 La. 418, 44 South. 159, the court said on page 421:

"If the prima facie case thus made out is not the real case, it was for the defendants to show it. The knowledge of their •

relations is in their possession, and not in the possession of the plaintiff."

The testimony of Sheriff Vial is that he knew Prudhomme, and always dealt with him as an employee of the railroad.

This statement, in connection with other testimony, is sufficient to establish the balance of probability or the preponderance of evidence in favor of the plaintiff. If Prudhomme was not an employee of the defendants, they knew it better than any one else, and they could have denied it by testimony; Prudhomme or the other trainmen were accused of having fired the fatal shot that killed Ursin, and the defendants were charged with civil responsibility of this deed. If it was not true, it was in the power of the defendants to have produced Prudhomme or the other employees as witnesses to deny it. The law is:

"The law of evidence is that when one of the parties to a suit has more means of knowledge concerning a matter to be proved than the other the burden of proof is upon him." 1 H. D., 237.

As far back as the year 1823 the Supreme Court said in the case of Powers vs. Foucher, 12 Martin 74:

"In the case of Delery vs. Momet; 11 Martin 4, and that of Nichols vs. Roland, id. p. 190, we held that the burden of proof lies on the party who has to support his case by proof of a fact of which he is supposed to be cognizant."

This principle has been followed ever since. Collins et al., vs. Andrews, 6 Mart. (N. S.) 195; Meilleur vs. His Creditors, 3 La. 534; Campbell vs. Miller, 1 Mart. (N. S.). 514; Offutt Bros. vs. T. H. Scribner, 10 La. Ann. 639; Griffin vs. Drainage Commission, 110 La. 840, 34 South. 799; Rugely, Blair and Co. vs. Gill, 15 La. Ann. 509; Bowman vs. McElroy and Bradford, 15 La. Ann. 663; Ford vs. Simmons, 13 La. Ann.

397; Arguimbau vs. Germania Ins. Co., 106 La. 139, 30 South. 148; 3 Orl. App. 285 (288); 13 id. 68; 2 Evans Pothier, p. 113; 22 C. J., p. 81, S. 24.

"When a defendant can by his own testimony throw light upon matters at issue, necessary to his defense and peculiarly within his own knowledge, if the facts exist, and fails to go upon the witness stand, the presumption is raised, and will be given effect to, that the facts do not exist." Bank vs. Levy, 106 La. 586, 31 South. 164; School Board vs. Trimble, 33 La. Ann. 1073; King vs. Atkinson, 33 La. Ann. 1057; Dotson vs. La. Central Lbr. Co., 144 La. 83, 80 South. 205; Carroll vs. Cockerham, 38 La. Ann. 823; Succession of Lampton, 35 La. Ann. 424; Burke vs. Fuller 41 La. Ann. 740, 6 South. 557; Pruyn vs. Young, 51 La. Ann. 320, 25 South. 125; Bastrop State Bank vs. Levy, 106 La. 587, 31 South. 164; State vs. Jahraus, 117 La. 286, 41 South. 575; 2 McGloin, 34; Tessier Dig., 70, 72.

"Failure of a party to call an available witness possessing peculiar knowledge concerning facts essential to a party's case, direct or rebutting or to examine such witness as to the facts covered by his special knowledge, especially if the witness would naturally be favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter gives rise to an inference that the testimony of such uninterrogated witness would not sustain the contention of the party." Pruyn vs. Young, 51 La. Ann. 320, 25 South. 125; Nunez vs. Bayhi, 52 La. Ann. 1719, 28 South. 349; Johnson vs. Marx Levy & Bros., 109 La. 1036, 34 South. 68; Hannay vs. New Orleans Cotton Exchange, 112 La. 1007, 36 South. 831; Rubenstien vs. Files, 146 La. 734, 84 South. 33; Toca vs. Rojas, 152 La. 319, 93 South. 108.

"Where facts are shown which are sufficient to throw doubt upon the reality of a transaction, the burden of proof is shifted to those who know the truth, and where they fail to furnish information within their knowledge the presumptions of law are against them." Nunez vs. Bayhi, 52 La. Ann. 1719, 28 South. 349; King vs. Atkins, 33 La. Ann. 1064; Lovell vs. Payne, 30 La. Ann. 511.

It is also the rule that the failure of a party defendant to produce as a witness his employee charged with the commission of a wrong is equivalent to an admission of the truth of the charge.

The failure of a railroad company to introduce the testimony of its employees who were on the train at the time of the accident raises a presumption of negligence against the company." Day vs. Rrd., 35 La. Ann. 694; 1 Thompson on Negligence, p. 514, sec. 6, affirmed in Ketchum vs. Rrd., 38 La. Ann. 777 (779) 22 A. and E. E. L., p. 1261, 2nd Ed.

In this case not only did the defendant fail to produce Prudhomme, or the trainmen, or the guard or detective, but when plaintiff's asked the attorney for the defendants, sitting as a witness, and another witness, whether Prudhomme or any of these employees were in the court room, evidently with a view of calling them as witnesses, the defendants objected, and the court maintained the objection. The counsel and the court were clearly wrong in obstructing the discovery of the facts and the truth in the case. 16 Cyc. 1063. But where a person is the natural witness of an opponent such as an employee, his mere production in court does not free the party producing him from the inference which may arise from his not being called. He is not really a witness equally available to both parties, etc."

The defendants have argued that there is no proof that Prudhomme was in their employ at the time of the trial. The proof shows however that he was in their employ at the time of the killing. There is no proof on the part of the defendants that the employment had ceased. When a state of facts is proven to have once existed it will be presumed to have continued until the contrary is proved. 22 A. and E. E. L.,

1240. The burden of proof was therefore on defendants to prove that Prudhomme was not longer in their employ on the date of the trial.

In Jackson vs. Rrd., 52 La. Ann. 1711, 28 South. 241, (bottom of page) the court said:

"When we add to this testimony the eloquent silence of the defendant upon the subject of Smith's employment, further comment becomes unnecessary. If he was not employed by it, some respectable and responsible officer would have so testified, as its learned counsel fully appreciated the importance of the question. * * * p. 1718.

"With the testimony which we have thus quoted in the record, it seemed rather significant that no officer or person connected with the defendant company should have taken the stand to say that Smith was not acting for it, or with its authority, in ejecting the plaintiff from its train." 1 Thompson, p. 514 (c); Maus vs. Broderick, 51 La. Ann. 1153, 25 South. 977; Dunn silent, claimant.

The last argument of the defense is that there is no proof that Prudhomme or any other employee whoever he was was acting within the scope of his authority and employment.

The duty of the guard and of the trainmen was to protect the property of the railroad, if they carried firearms we must presume that they did so with the knowledge and approval of their employers, and that they carried them for use. But it is immaterial whether their employees knew that they carried arms, the important point is that they did carry them and did use them while in the discharge of their duties. In the case of Vallon vs. I. C. Rrd., No. 9005 of this court, decided May 28, 1923, we said:

"The master is liable in damages for any negligent or illegal act committed by his

servant .in connection with, or in further-ance of the purposes for which the servant is employed."

The servant in that case was the loco-motive engineer.

The facts and issues in that case were very similar to those here.

So are the facts in Vincent vs. Morgan's La. Rrd., 140 La. 1027, 74 South. 541; Winston vs. Foster, 5 Rob. 113; Gann vs. Great Southern Lbr. Co., 131 La. 400, 59 South. 830; Mathews vs. Otis Mfg. Co., 142 La. 88, 76 South. 249.

In the case of Nash vs. Longville Lumber Co., 146 La. 475, the court said on page 480:

"When one person authorizes another to perform a certain function, lawful in itself and to be lawfully and cautiously per-formed, he becomes liable for the conse-quences to third persons if it be unlawfully or negligently performed and such persons are thereby injured, and the same rule applies whether the employer or principal be an individual or a corporation." Af-firmed in Nash vs. Longville Lbr. Co., 148 La. 943, 88 South. 226.

The defendants in their brief express themselves "aggrieved and outraged at the unfairness of the trial judge" under the guise of securing all the facts, in permit-ting the plaintiffs to introduce further evidence after the trial had been closed except for certain purposes. The judge's reason was that he "wanted light on the subject". The law is, C. P., 547, that courts may, "ex officio, direct a new trial in or-der to revise their judgments".

The jurisprudence has always been that courts may re-open a case before judgment or grant a new trial after judgment in the exercise of a sound discretion and in the interest of justice. Defendants cannot complain for they have not shown that they have suffered any injury by the order.

Different from the object of attorneys, the impartial judge's duty is to see that jus-tice is done to the litigant in each case, and his rulings should escape the harsh criticism of interested attorneys. We see in the judge's action nothing but the exer-cise of a fair discretion which has done no injury to the defendants and we therefore approve it.

In the case of Bastrop State Bank vs. Levy, 106 La. 587, 31 South. 164, Judge Blanchard said:

"Judicial tribunals are established to ad-minister justice between litigants, and the first and most important step to that end is the ascertainment of the truth of the controversies which come before them. It is only when the truth is ascertained that the law can be properly applied in the just settlement of disputes. Litigants owe the duty of assisting in every legitimate way in the elucidation of the truth."

And in Baham vs. Stewart Bros., 109 La. 999, 34 South. 54, Chief Justice Nicholls, on page 1011 said:

"It having been established that a peti-tion, with a citation accompanying the same addressed to A. J. Baham, was served upon the wife of A. J. Baham, it was his duty, if he was not the party concerned in the subject matter, to have appeared in the district court and excepted to the cita-tion."

In former times the law went further and made it the duty of every citizen to denounce a crime which came to his knowl-edge, and the failure to do so was denomi-nated a negative misprision and punished as a felony. 4 Blackstone, p. 83, S. 119.

The only remaining question is the amount of damages.

The rights of the plaintiffs in this case are composed of three elements:

First, the damages which the deceased suffered and which he transmitted by in-

heritance to his parents; and second, the injury which the plaintiffs themselves' sustained by reason of the death of their son, for the loss of his affection and society, and their grief; and third, the loss of his material assistance and support.    C. C., 2315.

The following amounts have been awarded to parents for the killing of a child:

In the case of Pierre vs. Powell Box Co., 142 La. 998, 77 South. 943, a judgment of $2500 in favor of two colored parents was increased to $7500.

The plaintiffs in that case recovered for the three elements.

In the case of Hubert and Wife vs. Baton Rouge Electric Co., 150 La. 957, 91 South. 406, the jury allowed each of the parents $7500 for the death of a child 3 years of age.

The Supreme Court reduced the judgment to $2500 to each of them.  In support of their judgment the court cites a large array of decisions of our Supreme Court. In that case the claim was only for suffering of the parents for the loss of the companionship of the child; nothing for the loss of support nor for suffering of the child.

In the case of Taylor and Wife vs. Vicksburg Rrd., 151 La. 270, 91 South. 732, a judgment was reduced from $7500 to $5000. But in that case the parents were respectively 70 and 56 and their son was instantly killed.  The judgment did not include suffering of the deceased child and no authorities are quoted.

In the case of Aymond vs. Western Union Tel. Co., 151 La. 184, 91 South. 671, the court said:

"A judgment in favor of the father for $10,000 for the death of a boy 14 years old, who was not assisting his father in any way but on the contrary dependent upon him, was excessive and should be reduced to $5000."

This judgment covered the suffering of the boy and the grief of the father.

In the case of Selser and Wife vs. Revol, 152 La. 447, a verdict of $15,000 in favor of both parents for the death of their son 9 years old, held excessive and reduced to $6,000.   This case is in line with the Aymond case cited above where the boy 14 years of age was not any assistance to his parents, the parents claimed for the suffering of their son and for their deprivation of his society.

In the case of Cherry and Wife vs. La. Ry., 121 La. 471, 46 South. 596, the plaintiffs were allowed $18,000 for the death of their two boys one 10 and the other 6. The boys were run over at 2 o'clock p. m., and died the next morning; one had a hand and foot cut off and the other a leg.  The damages recovered were for the suffering of the two boys and the loss of their society.

In Bourg vs. Brownwell, 120 La. 1009, 45 South. 972, plaintiff recovered $5000 for the death of his minor son 13 years of age based exclusively upon the loss of his son's society.

So in Buschner and Wife vs. City, 112 La. 599, 36 South. 603, the plaintiffs recovered $5000 for the drowning of their son nine years of age.

Also in Parker vs. Crowell, 115 La. 465, 39 South. 445, $5000 were allowed the father.

In the face of these decisions the judgment of the trial court must be increased.

As we have said before both the father and mother are plaintiffs in this case and both are claiming the three elements of

damages, viz:   the suffering of their son, the deprivation of his society and resulting grief, and the loss of support.   We have concluded to adopt a conservative figure and to increase the judgment to the sum of six thousand dollars.

It is therefore ordered that the judgment appealed from in favor of the plaintiffs and against the defendant the Texas & Pacific Railway Company be reversed and annulled, and it is now ordered that there be judgment in favor of said Texas & Pacific Railway Company rejecting plaintiffs demand against it at the cost of said plaintiffs.

It is further ordered that there be judgment condemning the defendant the Missouri Pacific Railroad Company to pay to the plaintiffs, Theodule Rousseau and Elizabeth Rousseau, his wife, the sum of six thousand dollars with five per cent per annum interest from judicial demand, December 17, 1921, until paid and all costs of suit.

Judgment amended.