(51 South. 663.)

No. 17,321.

LAZARUS v. FRIEDRICHS.

(Nov. 4, 1908. On the Merits, May 10, 1909. Rehearing Denied Feb. 28, 1910.)

*(Syllabus by the Court.)*

On Motion to Dismiss.

1. APPEAL AND ERROR (§ 628*)—DISMISSAL—FILING TRANSCRIPT OF APPEAL.

If an appellant files his transcript of appeal on the return day fixed by the judge, his appeal will not be dismissed although the return day so fixed is for a day later than that ordered by the statute. The appeal is saved by the provisions of article 898 of the Code of Practice.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 2751; Dec. Dig. § 628.*]

On the Merits.

2. EVIDENCE (§ 598*)—ACTIONS—WEIGHT OF EVIDENCE.

Where the testimony of the two parties to an alleged contract conflicts, and there are no other competent witnesses, and the preponderance of corroborating circumstances and proba-bilities sustains the defense, the demand of the plaintiff must be rejected.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2450–2452; Dec. Dig. § 598.*]

3. WITNESSES (§ 317*)—CREDIBILITY—CONTRADICTORY TESTIMONY.

The court cannot accept the testimony of a witness who deliberately contradicts himself, and undertakes to explain that, in testifying falsely or suppressing the truth, he was actuated by motives of interest.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1080; Dec. Dig. § 317.*]

4. ATTORNEY AND CLIENT (§ 118*)—DUTY OF ATTORNEY—ADVERSE INTEREST.

An attorney at law is bound to disclose to a client any adverse interest which he may have in connection with the business intrusted to him.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 238; Dec. Dig. § 118.*]

Breaux, C. J., dissenting.

Appeal from Civil District Court, Parish of Orleans; George H. Theard, Judge.

Action by Henry L. Lazarus against George G. Friedrichs. Judgment for plaintiff, and defendant appeals. Reversed and judgment rendered for defendant.

See, also, 117 La. 711, 42 South. 230.

Frank McGloin and Carl C. Friedrichs, for appellant. Farrar, Jonas, Kruttschnitt & Goldberg, T. M. & J. D. Miller, E. D. Saunders, and Richard F. Goldsborough, for appellee.

On Motion to Dismiss.

NICHOLLS, J. The appellee moves to dismiss the appeal taken in this case on the ground that the transcript herein was not lodged in this court within the time fixed by law, and that the delay is attributable to the defendant and appellant, and operates to the prejudice of the plaintiff and appellee.

The judgment appealed from was rendered on the 17th of July and signed on the 23d of July, 1908. The order of appeal granted the defendant was signed on August 3, 1908; and bond was given on the same day. The order of appeal made the same returnable on the

first Monday of October, 1908. The transcript of appeal was filed in the Supreme Court on October 5, 1908, which was the day fixed by law for the opening of the next ensuing term of court and the return day designated by the court's order.

Appellant concedes that the district judge should have fixed, under Act No. 106 of 1908, the return day for this appeal for a day not less than 15 nor more than 60 days from the date of the order of appeal, and not for the first Monday of October, 1908, as he did, that date being more than 60 days from the order of appeal, but he urges that the fixing of the date of the return day was not his act, was not imputable to him, and under article 898 of the Code of Practice the appeal should not have been dismissed. The facts of this case save the appeal from dismissal under the provisions of that article. See Hodge v. Monroe Mercantile Co., 105 La. 668, 30 South. 142. The motion to dismiss is denied and the appeal is maintained.

### On the Merits—Statement of the Case.

MONROE, J. Plaintiff brought suit in 1905, alleging that defendant owed him 100 shares of the stock of the New Orleans Jockey Club, for services rendered, as an attorney at law, in connection with the establishment of that corporation, and he obtained judgment for one-half of that which he claimed, upon the theory that he had proved that "there was, in substance, a joint understanding on the part of the defendant and his associate, Brown, to pay plaintiff $10,000, or $5,000, each, in stock of the proposed New Orleans Jockey Club, for his professional services in the formation of the corporation, and for his assistance in organizing the same and securing subscriptions to the capital stock thereof, and that he had fully complied with all his obligations thereunder."

Defendant appealed from the judgment so obtained, and, upon the hearing in this court, it was held (quoting from the syllabus, as reported):

"Where the pleadings and the evidence show that a certain verbal contract was either for a contingent fee or for promoting the organization of a Jockey Club, a judgment, based on both theories, is clearly inadmissible."

Quoting from the opinion:

"This finding (of the trial judge) is contrary to the pleadings and evidence, on both sides of the controversy. The issue of fact before the court was clear cut, and admitted of no controversy. Under the pleadings and evidence, the question was whether the consideration of the contract was services as attorney, or services as a promoter. No witness on either side testified that the contract covered both kinds of service. There were only three persons present when the contract was made, to wit, plaintiff, defendant, and Brown. On the cold record before us, the plaintiff has failed to make out his case, his testimony being contradicted by that of the other two parties to the transaction."

The judgment of the district court was therefore reversed, and the suit dismissed, as in case of nonsuit. Lazarus v. Friedrichs, 117 La. 711, 42 South. 230.

In June, 1908, plaintiff brought the present suit, on the same alleged contract, praying that defendant be condemned to deliver to him the 100 shares of stock, or, in default thereof, to pay the highest market value attained by the stock since the date of its issuance. Defendant excepted, on the grounds: (1) That plaintiff, having been cast in the first, has no standing to prosecute the second, suit, on the same cause of action, until the costs of the first suit have been paid; (2) that plaintiff appears to be here seeking to recover for alleged services both as attorney and promoter, whereas, in the previous suit, he alleged that the services were rendered solely in his capacity as attorney. The exception first stated was overruled. The other was maintained to the extent that plaintiff was ordered to elect "whether he sues on a contract solely for professional services, as attorney at law, or on a contract for undertaking to make good the failure of Brown

to pay his (Brown's) subscription of $100,000 to the capital stock of said company (the New Orleans Jockey Club), and for obtaining a large amount of subscriptions to said stock, raising funds to help place said Jockey Club on a safe footing and insure its success." And plaintiff filed an amended petition, which was accepted by the court as sufficiently setting forth that he relies upon a contract for services rendered solely as attorney' at law. Defendant, for answer, pleads the general denial, and further answering, says:

"That the only contract of any sort ever proposed between petitioner and defendant was a joint one on the part of respondent and of Harry D. Brown; that the consideration from plaintiff was to be services rendered by him in helping to promote, financially, the enterprise in question, and in disposing of a large part of the capital stock of the New Orleans Jockey Club, and particularly by placing a large block of stock which the said Harry D. Brown had originally obligated himself to dispose of, but was unable to place, which understanding was abandoned by petitioner and which promises were never fulfilled by him."

Upon the trial of the first exception, it was shown that, prior to the institution of this suit, defendant had presented to plaintiff, at the latter's request, a statement of the costs disbursed by him in the first suit, which, in addition to the costs of the clerk and sheriff in the district court and of the appeal, included two items, of $22.50 and $50, paid to the stenographer, and the following admission was made, to wit:

"It is admitted that these bills, $22.50 and $50, as shown in the statement attached to the exception, are correct and were paid by the defendant; and it is also admitted that Mr. Oliviera's services were employed by both sides, in the original cause—the first case of Lazarus vs. Friedrichs, No. 76,226 of the docket of the court. It is also admitted that the amount of the sheriff's fees and clerk's fees and binding of transcript and Supreme Court costs, as shown on the statement annexed to the exception in the cause, are correct, and were paid by the defendant in that case."

It was shown that plaintiff made a tender to defendant of the amount called for by the statement referred to, less the two items paid to the stenographer, and that defendant declined to accept the amount tendered, after attempting to communicate with his attorney, through the telephone, for the reason that his attorney was away from his office, sick, and that he thought it was due to him that he should consult him before acting and, for the further reason, that the amount tendered was less than was due. No subsequent tender appears to have been made and no offer to pay or reimburse the costs in question was made upon the trial of the exception.

Upon the trial on the merits, as upon the former trial, the only witnesses who testified (or who could have testified, since they alone were present) as to the contract out of which the suit arises were plaintiff, defendant, and Brown. But the situation, on this last trial, was changed in the following respect, to wit: On the first trial, Brown testified that he subscribed to $100,000 of the stock of the club with the expectation of getting some people, whom he knew, in other states, to take it off his hands, and that he went to Hot Springs, St. Louis, and Chicago for that purpose, but was wholly unsuccessful.

"So" (he continues, quoting him literally), "I returned to the city and informed Mr. Friedrichs of my position. Mr. Friedrichs then informed me that, during my absence, he had several conversations with Judge Lazarus, and that Judge Lazarus informed him that he could get all of the stock subscribed or taken up here among his friends that I was not able to secure, abroad, and that Judge Lazarus had made a proposition to Mr. Friedrichs that if Mr. Friedrichs would give him $10,000, he would undertake to complete the promotion of this race track, and to carry, or assist in carrying my end of it to a successful termination. * * *

"We went and saw Judge Lazarus, and talked to him, and he informed me, in Mr. Friedrichs' presence, that he could secure enough subscriptions among his friends to the stock— enough to complete or fill the subscription. I asked Judge Lazarus, then, what he wanted for his labor, and he said that his services would be worth $10,000. I asked him if he didn't think that was too high, and if he didn't think $5,000 was sufficient. He said 'No'; his services he had fixed at $10,000, and if we wanted his assistance, that is what we would have to

pay—$10,000. * * * And so we agreed to pay him (that is, Judge Lazarus) $10,000, in the event Judge Lazarus could make good what he said in having the stock taken up and assisting us in getting a good representative directory. * * *

"Q. In any of those interviews with Judge Lazarus, was anything said about his being paid simply for attorney's fees?

"A. No, sir; he was never promised any attorney's fees, but, in the first interview, it was agreed that for the services rendered us we were to make him the attorney for the New Orleans Jockey Club, which we did, but this other proposition was after consideration of a month or so later."

On the last trial, the same witness testified as follows:

"On my return from my trip to Hot Springs, St. Louis, and Chicago, as I have stated, I visited Mr. Friedrichs at his office. He wanted to know what success I had had on my trip, and I informed him. Mr. Friedrichs then informed me that since my departure he had had several conversations with Mr. Lazarus, and that Mr. Lazarus had asked him for a fee of $10,000 to assist us in the organization and in the completion of the Jockey Club business. I asked Mr. Friedrichs what he thought of it, and he informed me that he thought we had better pay it to Mr. Lazarus as Mr. Lazarus could be of a great deal of assistance to us in creating and forming this club. * * * I asked Mr. Friedrichs what he thought Mr. Lazarus could do. He informed me that Mr. Lazarus was thoroughly imbued with the race track proposition, that he had lots of friends here in this city whom he thought he could get to subscribe for stock, and Mr. Friedrichs informed me that he thought it would be worth while to pay him $10,000 to get his assistance. I said: 'If you think he can do as you say he can, I think he is well worth the $10,000.' I says: 'Suppose we go upstairs and see Judge Lazarus and have him tell us what he thinks he can do, and get his ideas.' Mr. Friedrichs said, 'All right,' and we immediately went to Judge Lazarus' office. I asked Mr. Lazarus what he thought he could do, and he told me what he thought he could do, in the way of getting people to subscribe for stock, and informed me that, inasmuch as there was a great deal of work with regard to organizing and creating a corporation, it would require a great deal of his time and services, and that he thought he could render us that much service. I said to him: 'Well, Judge, you seem to think you can get a lot of people to subscribe to the capital stock of this corporation, suppose you undertake to get your friends here to subscribe on a five per cent. basis—a five per cent. commission basis; we will pay you five per cent. for all subscriptions that you get.' He said: 'No; I will not do anything of that kind.' He says: 'You fellows might rush out and get the thing oversubscribed, and

not give me a chance to earn anything in this thing.' He says: 'I am willing to go in and help you and render you all the assistance I possibly can, but, if I do it and put in my time and labor, I have to be compensated for it.' And says, 'I fix the amount for my compensation at $10,000; if you folks want my services.' He says: 'I will give you my services—my legal services—for $10,000, and I will do all I can in the way of getting subscriptions and helping you to get subscriptions to the capital stock.' He says: 'You seem to be having some trouble in getting a good representative board of directors. I will get out and assist you in getting stock subscriptions and good men to go on the board of directors.' I asked the judge if he didn't think $10,000 was a little too much for his services. He said: 'No, sir; I have fixed my compensation at $10,000. If you want my services in this matter, it will cost you $10,000, and I will not allow anybody to fix my compensation for services.'"

The attention of the witness was called to the following paragraph from his testimony, as taken down in the former trial, to wit:

"I informed Mr. Friedrichs, then, that if Mr. Lazarus could do as he said he could do we could well afford to give him $10,000, and I asked Mr. Friedrichs if he thought Judge Lazarus could do as he really says he could, and Mr. Friedrichs said: 'I really don't know whether he can; but we can go and see him and talk the situation over.' Now, Friedrichs said: 'The fact of the matter is, I don't think he can.' He says: 'He has got our secrets, and if he tips them off to Bush, the opposition, we are ruined, and we can't carry our plans through, so we will have to go and see him and talk to him about it, and if he can do all he says, very well. We will go and see him.' We went, and saw Judge Lazarus, and talked to him, and he informed me, in Mr. Friedrichs presence, that he could secure enough subscriptions among his friends to the stock, enough to complete or fill the subscription."

And he (Brown) was asked:

"Was that testimony correct?" to which he replied (after having had the paper from which the excerpt is taken submitted for his examination), "That is correct, this far, with the exception that I testified that Judge said he thought he could secure, or assist us in securing, enough. * * * He didn't state, positively, at the time, that he could. He said he thought we could secure enough subscriptions in this way without going on the outside, and he could assist us in getting them."

And, so, throughout, not in one instance, but in a number of instances, in which the witness had previously testified, distinctly

and emphatically, that plaintiff undertook absolutely to fill out the required subscriptions, and that there was no agreement with him as to services to be rendered in a professional capacity, he now undertakes to say that he should have testified that he and defendant agreed to give plaintiff $10,000 (meaning $10,000 in stock) for services to be rendered, as an attorney, and because he said he "thought" he could assist in getting subscriptions.

Plaintiff's counsel intimates very broadly that the testimony given by Brown in the former trial was false. But they gravely assure us that the last testimony given by him may safely be relied on. They say (in a printed brief):

"Whatever may be said of Brown's evidence, on the former trial, and whatever criticism it may be subjected to—it was not as clear and as full as he could have made it. He did try to be accommodating and, incidentally, to protect himself. He explains his former testimony, and adds that he didn't have an opportunity to read it after it was transcribed. It is indisputably true, however, that his evidence on this trial is a correct narration of the dealings and transactions between Lazarus and Friedrichs. He had no longer any interest in the controversy; his stock was no longer threatened with seizure; he had had his settlement for the moneys advanced and disbursed as promoter, wherein Friedrichs and he shared alike; he was no longer under Friedrichs' influence or control, nor directed to answer, only limitedly, the questions put, or to suppress the information he had and to volunteer no information that he possessed."

Counsel for defendant says, in effect, that the testimony which we are thus assured is "indisputably true" is unquestionably false. The judge a quo, after trying, as he states, to reconcile the testimony which the witness was giving with that previously given by him, felt called on to say to him:

"I want to warn you that there is such a thing as prosecution for perjury."

Our conclusion is that none of the testimony is to be believed merely because the witness has sworn to its verity. He was, however, present when the contract here in question was made and participated in the making of it, and where his statements do not conflict with those of the other parties, or with any reasonable probability, they may be accepted to aid in completing the narrative. Proceeding upon that basis, we find that some time in January, 1904, defendant (whose place of business was almost underneath the offices of the plaintiff) introduced plaintiff to Brown as a person who was about to open a hotel and who was also interested in racing, and he mentioned the fact that he (defendant) owned a body of land, near the lower City Park, which he thought might be available as a race track. Plaintiff and Brown expressed some doubts on that point, but they both (though not together) took occasion shortly afterwards to visit the land, and became convinced that it would answer the purpose mentioned. Precisely why plaintiff should have given himself the trouble to get up in the early morning to make such a visit is not explained upon any theory connected with the legal profession, unless the explanation be found in the fact that, about three years before, he had had occasion to inquire and to speak to defendant about land for a race track, in behalf of some friends or clients in the North, and it may have occurred to him that he might resuscitate an enterprise which had then been abandoned. However that may be, the parties mentioned appear to have met once or twice afterwards, and to have talked of a race track in a general way, and defendant and Brown apparently discussed the subject in such a particular way as finally to reach a definite understanding, which they concluded that they would go upstairs to plaintiff's office and get him to reduce to writing for them; the result being two written instruments, signed by Friedrichs and Brown, and dated February 4, 1904. The one instrument (identified in this case as P 1) reads as follows:

"Memorandum of agreement entered into, this day, between Harry D. Brown and George G. Friedrichs, witnesseth:

"Whereas, Harry D. Brown has undertaken to promote and organize a jockey club for racing and for athletic sports, and undertaken, in the organization of said corporation, to capitalize the same for a sum not less than $300,000, which stock shall be full paid.

"Whereas, George G. Friedrichs owns the following described property available for a race track and for athletic sports of all characters, and which property is of the following description, to wit:" (Describing a tract of 100 acres, forming part of a larger tract, of 185 acres, lying near the lower City Park.)

"It is agreed that, upon the organization of said corporation and the subscription to the capital stock of said corporation, as herein provided, and the payment into the treasury of said corporation of a sum of not less than $25,000 in cash, George G. Friedrichs binds and obligates himself to sell the aforedescribed property to said corporation for the sum of $100,000; $20,000 of which sum be paid in cash shall be at once applied to the release and discharge of liens and mortgages operating upon said property so transferred, and for the balance of said purchase price, to wit, the sum of $80,000, said George G. Friedrichs agrees to accept, in full payment therefor, $80,000 of the capital stock of said corporation, fully paid and nonassessable; and upon the delivery to him of said $80,000 in stock, and the payment of $20,000 as aforesaid, to be applied to the release of the mortgages operating upon said property, he, the said Friedrichs, obligates himself to make a good and valid title to the New Orleans Jockey Club of the property aforesaid.

"It is further agreed between the parties hereto that, if, after the subscription and payment into the treasury of $50,000, and the application of $20,000 thereof to the retirement and extinguishment of the liens and mortgages operating upon the property of said Friedrichs, as aforesaid, there should be, from any cause, a failure to carry out and complete said corporate organization, resulting from the inability, on the part of said Brown, to secure subscriptions to said capital stock equal to the sum of $250,000, then in that event the corporation thus organized, as contemplated and provided for herein, is to retransfer the property back to said George G. Friedrichs upon the surrender by him of the $80,000 of the capital stock delivered in part payment of the property aforesaid. And said George G. Friedrichs obligates himself to reimburse to the corporation the $20,000 advanced for the purpose of extinguishing the mortgages and privilege operating upon the property transferred. It is agreed that this option shall remain in force for a period not exceeding six months, at the expiration of which time the stipulations and agreements contained herein shall, at the option of said, George G. Friedrichs, be null and void.

"In witness whereof, the said parties have hereunto set their hands, this fourth day of February, 1904, in duplicate.

"[Signed]   George G. Friedrichs.
"Harry D. Brown.
"Witness:
"[Signed]   Henry L. Lazarus."

The other instrument (marked in the record P 2) reads:

"New Orleans, Feb. 4, 1904.
"Mr. Harry D. Brown, New Orleans, La.

"Sir:   When the New Orleans Jockey Club has been organized and has acquired the land described in the memorandum of agreement entered into this day between us, and which is to be treated as concurrent with this obligation of mine, and I shall have transferred the property described and received in payment therefor the $20,000, stipulated, and the $80,000 of full paid stock, I bind and obligate myself to deliver to you, in consideration for your services in effecting said transfer, and for other services rendered to me, forty thousand, of the eighty thousand, dollars of the capital stock of said New Orleans Jockey Club I shall have received in payment for the land sold.

"[Signed]   George G. Friedrichs.
"Accepted:
"[Signed]   Harry D. Brown."

Plaintiff also dictated the caption of a subscription list, setting forth the scheme in contemplation, the amount of the capital stock of the proposed club, the value of the shares and the conditions upon which the subscriptions should be called in, which list was signed by Friedrichs, for 250 shares, by plaintiff, for 50 for himself and 25 shares for another person, and by Brown for 100 shares (which, a little later, was changed to 1,000). Plaintiff was then asked what his charge for the service thus rendered would be, and he replied that, as the other two were going into the matter as a speculation, he would be willing to take his chances with them, and that if they would agree to get him the attorneyship of the proposed club he would make no charge for what he had done, which he did not consider of much consequence; and Friedrichs and Brown agreed to the proposition, and thereafter faithfully complied with their agreement, for not only was plaintiff made the attorney of the corporation, when created, but he was the attorney

of the corporation in embryo, and so far as we can discover, no other attorney has ever represented it. Brown had given it out that he had some racing people of means behind him, and among them a Mr. Smathers, and shortly after he had made the agreement with defendant, as stated above, he went to Hot Springs, St. Louis, and Chicago to get the subscriptions that he had agreed, and perhaps expected, to obtain. We have already seen that he failed in his mission. He so testified, in the first trial, and has so testified in this case, and, though later in the year, in June, August, September, etc., he was in New York and Chicago telegraphing to defendant of subscriptions that he was obtaining, and expecting to obtain, and which, for the most part, were never obtained, that circumstance had no bearing on the situation as it existed in New Orleans between February 4 and March 7, 1904, and which was that he was in hopeless and admitted default with reference to a subscription which had been held out to the New Orleans public as bona fide, and upon the faith of which others had been induced to join in the enterprise. Tortorich, who was made a director of the club, testifies that, upon the list he signed, H. D. Brown & Co. appeared as subscribers for 1,000 shares; that he asked Brown who H. D. Brown & Co. were, and that Brown told him that Smathers was the "Co."; that he knew Smathers by reputation; that if it had not been for Brown's statement concerning his connection with the matter, he (Tortorich) would not have subscribed; and that he did not learn until after he had made several payments that Smathers was not interested with Brown. Plaintiff alleges in his petition:

"That on or about March 7, 1904, the said Brown, having returned from the North, he and the said Friedrichs came to the office of your petitioner, and your petitioner insisted that the said Friedrichs, who had repeatedly promised to compensate your petitioner liberally for his professional services, should make a definite agreement with your petitioner. as to the fee to be paid to your petitioner for his services in consulting and advising the said Friedrichs regarding the formation, capitalization, and organization of the said proposed Jockey Club which was to acquire said property, and all of the other professional services that your petitioner might render in the matter to said Friedrichs personally. It was thereupon agreed between your petitioner and the said Friedrichs that petitioner should be paid for his professional services in the said matter by said Friedrichs 100 shares of the capital stock of the said proposed Jockey Club, full paid and non-assessable, when and if said Jockey Club should have been formed and organized and should have purchased the property of said Friedrichs, and the said Friedrichs and the said Brown declared that they would use their influence to have your petitioner elected attorney of said Jockey Club, when the same should have been organized."

In support of these allegations, plaintiff says in his testimony:

"I said: 'If you' (Friedrichs) 'succeed in disposing of this property at the price fixed, I think 100 shares of the stock that you receive would be a fair compensation for my services. * * *' My professional relations with Friedrichs terminated when the Jockey Club agreed to take the property, if the title was all right. That. is as near as I can give it. * * * Q. Suppose the title had proved bad, and the Jockey Club had rejected it, your fee being contingent, would you have earned the $10,000 from Mr. Friedrichs? A. No, sir; my employment was contingent on the Jockey Club paying him for 100 acres of ground, $100,000 in stock of which I was to receive 100 shares. * * * Q. Therefore, Judge, the contingency in your contract extended to the actual acceptance of the property by the Jockey Club? A. The acceptance of the property; yes, sir. Q. And the passage, also, of the title to the Jockey Club? A. Of 100 acres; yes, sir. Q. And as attorney for the Jockey Club, you examined the title and reported on it? A. I examined the Larrieu tract—that Mr. Friedrichs acquired from Larrieu—out of the Allard plantation. It was examined by Mr. Michel, and our examination was as to the 180 acres, and the lines were given by Mr. Friedrichs, and that title, I say to-day, is a perfectly valid good title—how much property he took from somebody else, I don't know. The same title was examined by you, I understood and I know, at the office of Farrar, Jonas & Kruttschnitt. Q. We are not questioning the soundness of your examination, one way or another, but, to whom did you report that that title was good? A. As to the 100 shares? Q. Yes, sir. A. The Jockey Club. Q. It is recited in the minutes? A. Yes, sir. * * * Q. Who was president of the Jockey Club at that time? A. Mr. Heaslip. Q. Did you ever report to Mr. Heaslip, when you were examining the title to that property, that you had a contingent contract with Friedrichs for $10,000,

the payment of which would depend on the Jockey Club's accepting the title? A. I don't think I did; I don't think I was called on to do that, any more than when you examine for the Provident Bank a mortgage, and charge them a fee and they accept the title. * * * Q. Now, did one of them—did Mr. Heaslip, or Bell, or any of the directors, leaving out Mr. Friedrichs—did any of them know that you had a contingent fee of $10,000 due you by Friedrichs, dependent, at the last, on the acceptance by the Jockey Club of the title to the property that you passed on? By Mr. Farrar (counsel for plaintiff): I move that this examination be stricken out, as irrelevant to any issue in this case—all this examination about his examining the title for the Jockey Club, or about not reporting the fact of his contract with Friedrichs to the president of the Jockey Club, when he undertook to examine the title. By the Court: I am not inclined to allow the motion to strike out (exception and bill). By Mr. McGloin (counsel for defendant): Q. We will pass from that question. You testified, in your original testimony, on page 9: 'He said, "Judge, I don't think $10,000 is fair." I said, "I won't discuss it with you, Mr. Brown." And Mr. Friedrichs spoke up and said: "Well, I don't think that it is too much." And he said: "Of course, this fee is entirely contingent; if the club is not organized, and the property is not sold, you are not to have anything for your services, and, if I sell my property to the club for $100,000, I think $10,000 for your services, for assisting in this matter, is fair enough. I am going to give it to him, Mr. Brown, and I am going to take from you $5,000 of your stock for your reward and compensation." ' By the witness: That is absolutely correct. There is something else in the testimony that you have not read—that I said: 'I will look to you, George Friedrichs, for the delivery to me of the stock. I have no business with Mr. Brown.' Q. Now, again, you were asked: Q. 'What did you engage to do for that?' And you answered: A. 'To advise them professionally, and assist them in promoting and effecting the sale of the property from Friedrichs to the Jockey Club, for $100,000, all of which I did do.' Is that correct? A. Let me look at that question and answer, please. (Note—witness is handed the testimony.) A. I have no doubt I used those exact words, and they speak the truth. The word 'promoting' should have been qualified by 'promoting the organization'—the legal organization and not securing subscriptions."

The record shows that the club contemplated improving the property in question, and, as a matter of fact, did at once place valuable improvements on it. In this same connection, we find in the record a letter, addressed by plaintiff to the club, of date April 3, 1907, in which he incloses a bill of $16,600

for services rendered, and requests that the club credit $4,000 on his stock subscription and send a check for the balance. The letter reads, in part, as follows:

"April 3, 1907.
"New Orleans Jockey Club, New Orleans.

"Gentlemen: After nearly three years of continuous service to your association, under your direct employment, in which I have met with success, I have concluded it is time that there should be a substantial recognition of the services which I have rendered and which have inured to your benefit and advantage. * * * You will oblige me by forwarding your check to cover the bill and also my certificate of stock for 50 shares of the New Orleans Jockey Club.

"Yours very truly,
"[Signed] Henry L. Lazarus."

Heaslip, the president of the club, is asked:

"Q. Judge Lazarus has testified—the testimony of Judge Lazarus is—that he and Mr. Friedrichs had an agreement in the beginning of the enterprise that he was to render certain professional services to Mr. Friedrichs, and was to secure the disposition to the Jockey Club, to form the track, of the ground now occupied by the race track, and that on its purchase by the club he was to receive $10,000 for his services from Mr. Friedrichs, as president of the company, were you aware of any such claim?"

And the witness answered:

"No, sir."

He was then asked, "If you had been aware of the fact, would you have accepted Judge Lazarus to have examined the title?" and the question was objected to by plaintiff's counsel as "collateral, immaterial, and irrelevant," and the objection was sustained. The witness Brown (who was one of the directors of the club) testifies that "to the best of his knowledge none of the directors, save, perhaps, Redesheimer (who was defendant's partner in business), knew that Judge Lazarus claimed to have a fee of $10,000 due by Friedrichs, depending on the Jockey Club buying this property of Friedrichs." Friedrichs testifies, in part, as follows: He says that he and Brown had discussed the race track proposition until they had arrived at an agreement, and he proceeds:

"After we concluded all our arrangements, it was late in the evening, and Brown wanted a lawyer. So I remarked, 'We have a lawyer next door, upstairs—Judge Lazarus.' I says, 'Let's go there and conclude it with him.' So we went up there. * * * Well, when he got through writing all these documents up, and we had signed them, we naturally asked what was his compensation for that little service. * * * Well, he said: 'Gentlemen, if you contemplate creating a jockey club, why,' he says, 'this matter is of small consequence to me; if you can get me the attorneyship of the club, I will not charge you anything for this service.' Q. Did you agree to that? A. Yes, sir."

He says that Brown professed to have backers who were able to subscribe the whole amount ($300,000) of the capital of the club, but that, in order to obtain local support, it was thought better that he should subscribe for only $100,000.

"He said" (continues the witness) "Mr. Smathers and his associates would put it up; that he had a real backing."

The witness says that Brown subsequently admitted to him that he had nobody behind him, and that he communicated that information to Judge Lazarus, his testimony proceeding as follows:

"Well, during Brown's absence, I had occasion, or perhaps Judge Lazarus sent for me, regarding these matters of the Jockey Club—I regarded him as the attorney of the Jockey Club— I was treasurer of the association, and, during the absence of Brown, I informed Judge Lazarus that he had better go a little slow; I wanted to see Brown before we made much further headway; that we had a whole lot of subscriptions out; that my name was used, and Col. Heaslip's, and that the public promise was given that solid, substantial, millionaire, race-horse backing was given to the enterprise, and that the public, under that, had subscribed. * * * He says: 'Why, I can make that subscription of Brown's good.' He says, 'Don't you remember, two or three years ago, I employed or you were employed to looked after certain property; I can get my friends to take up this subscription; it will be all right.' Q. What proposition did he make? A. He wanted $10,000. Q. For doing what? A. For getting—for making Brown's subscription good."

He then speaks of Brown's return, of his discussion with him of the proposition made by plaintiff, of their going to plaintiff's office and talking it over with him, of plaintiff's going out and leaving Brown and the witness together, and of their continuing the discussion, thus:

"So I told Brown; I says: 'I will tell you, I feel myself very much compromised about this matter; I will be willing to put up $5,000 of the $10,000 that Lazarus demands, and, when he comes back, let's arrange it with him on that basis. * * *' Q. What understanding did you finally arrive at with him—between you and Brown and Lazarus? A. My understanding with Judge Lazarus was, with Brown, that we were to pay him $10,000—$5,000 each—for securing Brown's subscription, or procuring it, abroad, which he said he could do from his friends, and for helping on the general subscriptions. That was the contract. Q. Judge Lazarus contends that the understanding and contract was that he was to be paid for services strictly professional; was that true, or not? A. It is absolutely untrue. Q. Would you state who was your personal counsel at that time? A. You were, Judge."

The evidence shows that Brown appealed to plaintiff for assistance in making good his subscription, and that plaintiff gave him a letter to some man in Chicago, who Brown says treated him and his letter with contempt, and it is quite certain that plaintiff did not make good Brown's subscription and that he did but little in the way of helping on the general subscriptions, the fact being that defendant, who occupied a position in the community, having held out Brown who had no position as a responsible man, found himself obliged to make good his representations, and in order to do so he was compelled to put his hand very deeply into his pocket. It does not appear that, prior to the dealings out of which this suit has arisen, defendant had ever employed plaintiff to attend to any business for him, and it does appear that the counsel who now represents him has always done so, save in particular cases, where, for particular reasons, other counsel were employed. Mr. Bell, who was the secretary of the Jockey Club for a year or more after its creation, testifies that Judge McGloin represented defendant in all matters in which he and the club had separate interests, and also in matters before the city council in which

their interests were identical. The charter of the club bears date March 26, 1904, and the minutes of the meeting of the board of directors of April 18th show that "Judge Frank McGloin, Walker Spencer, and Judge Lazarus, representing, respectively, the interests of George G. Friedrichs, H. D. Brown, and the New Orleans Jockey Club, were present, by invitation"; and that Spencer and Lazarus were instructed to address letters to the city council in regard to a threatened expropriation proceeding. There is some testimony adduced for the purpose of showing that, in loose talk, on two occasions, defendant admitted the obligation that plaintiff is now seeking to enforce. On one occasion, Mr. O'Connor, Mr. White, and defendant were engaged in conversation, either in, or near, an office building, when plaintiff and his partner came up, and there was something said about the money that defendant had made at the race track, and (to quote the testimony of O'Connor) "Judge Lazarus, or his partner, said something about this matter and about the money they had made, or something like that, and about what they were entitled to, or what was coming to them, and I said to Mr. Friedrichs, 'Why don't you pay them what is owing to them.' He said, I believe, 'Well, I owe Judge Lazarus some money for his services in this matter'—something to that effect." And the witness afterwards says that defendant mentioned the amount as $10,000. White says that they were laughing and joking and that it was probably suggested that, as Friedrichs had made so much money, he should treat the crowd; that Friedrichs protested that he had not made any money, and that he said, " 'I have to pay Judge Lazarus, there, $10,-000,' or 'I have got to give him $10,000,' or, 'He wants $10,000'; I don't know which of the three he said." The testimony was given in April, 1908, and both of the witnesses fix the date of the conversation approximate-ly as two years prior to that time, or, say, in 1906. Plaintiff had, however, filed his first suit in May, 1905, and it is hardly to be supposed that defendant would have admitted, in a loose street conversation, an obligation that he was expending money to resist in court. The other occasion referred to was in January, 1905, when it is said that plaintiff, meeting defendant in court when he was just coming off, or going on, a jury, asked him about his stock, and defendant replied that he had not gotten the stock and would give plaintiff his when he did so.

A few weeks before that, however, according to the testimony of a Mr. Bell, who was in defendant's employ, defendant had distinctly repudiated the idea that he owed plaintiff anything, and sent Bell with a message, which Bell says that he delivered, to that effect. Plaintiff says that the message delivered by Bell was different, so it is evident that he and Bell misunderstood each other, which was, no doubt, the case as between plaintiff and defendant upon the occasion to which plaintiff refers.

## Opinion.

We are inclined to think that this suit should have been dismissed on the ground that the costs of the previous suit had not been reimbursed to the defendant prior to its institution, but we pretermit the question, because, having reached the conclusion that there should be judgment for defendant on the merits, we think he is entitled to have the matter disposed of in that way.

Plaintiff and defendant flatly contradict each other as to the terms of the contract out of which the suit arises, and the only other person who was present when the contract was made has disqualified himself by testifying both ways.

There is, we think, a preponderance of corroborating circumstances and probabilities upon the side of the defendant. Plaintiff,

having drawn up the agreement between defendant and Brown, having prepared the caption of the subscription lists which they were to use, having, himself, and for another, subscribed to the stock of the embryo corporation, and having, in consideration of the service so rendered, been practically assured of the attorneyship of the corporation, occupied a position which justified and invited consultation on the part of those with whom he thus became associated, as persons having a common interest with himself, and, as defendant had an office almost at the foot of the stairs which led to the office occupied by plaintiff, it is not surprising that they should have met quite frequently, or that they should when they met have discussed the affairs of the club in which they were concerned. Plaintiff confuses the situation as it existed on March 7, 1904, with matters which arose subsequently, and confuses questions which he was called on to investigate, in his capacity as attorney of the club, with matters relating to the personal interests of the defendant, with which he was not called on to concern himself at all. The contract in question was made on March 7, 1904. Prior to that time, so far as the record informs us, nothing that had been done or said, looking to the expropriation of defendant's land, had come to his ears or to the ears of the plaintiff. And in fact nothing appears to have been done, save that, on the day or night before (March 6th), the commissioners of the City Park had adopted a resolution to the effect that the city council should be memorialized to expropriate the land in question and turn it over to them for park purposes. If, however, either plaintiff or defendant were aware, when they met on March 7th, of the action so taken, that fact is not disclosed by the record. We do not find in the testimony of either plaintiff, defendant, or Brown that in the discussion which took place on that day there was any, even the remotest, allusion to any question of expropriation, and still less of any burden of labor or responsibility that would be imposed on plaintiff as defendant's attorney on that account. And yet plaintiff's counsel say, in their brief:

"Now, what were the services that Lazarus was to render for the compensation that was promised him, and what service did he render? * * *

"First. There was an examination into the question of the right of the city of New Orleans to use the money, devoted under the acts of the Legislature to the maintenance of the park and its purposes, and to apply it in the acquisition of property.

"Second. The right of the city of New Orleans to expropriate the property and the ascertainment of the question whether the necessity for and the right of expropriation was legislative or judicial.

"Third. The consideration of the question, under what law a jockey club could be incorporated —what would be its declared purposes, and objects. This invited a study of the various statutes of the state incorporating jockey clubs.

"Fourth. What would the rights of the subscribers to the stock be, in the event of the expropriation of the property at a price less, or more, than that paid by the club.

"Fifth. Whether the land could be transferred for stock, at the price stated, when the fact was, that it was purchased by one of the promoters, within six months' time, at about one-twelfth the price which he was to receive.

"Sixth. Whether that would operate a fraud upon the law, or whether the promoter had the right to receive fair value for the property acquired by the corporation which he was organizing; what was the true value of the property, for the purpose for which it was to be used; and was the transaction, as between the promoters and the contemplated organization, an honest transaction; how the property was to be transferred and Friedrichs to be paid, as contemplated by his agreement with his promoting associate, Brown."

Considering the items "First," "Second," and "Fourth," we are at a loss to understand why the defendant should be charged for an examination into the right of the city of New Orleans to expropriate property or to use particular funds for that purpose, when he had not asked plaintiff to make such examination, when, for aught that appears, he at that time had no interest in the question, and when, as appears from the evidence, if he had been interested in it, he would have

employed the counsel by whom he has been advised all his life. Plaintiff does not undertake to say that he would have conducted, on defendant's behalf, any litigation which might have arisen out of an attempted expropriation for the fee for which he is suing, and we infer that he would not have done so, as he is charging the club $13,250, for services rendered in litigation of that kind, which arose some time later. As to item "Third," plaintiff had been selected as the attorney of a corporation for which a charter was to be provided, and, naturally enough, that invited a study of the various statutes of the state authorizing the establishment of such corporations. But why should the expense fall entirely upon one stockholder of the Jockey Club? Why should not the plaintiff himself and the other stockholders contribute to it? And particularly where, as in this case, it does not appear that the one stockholder had knowingly consented to bear the expense, or that there is any power lodged elsewhere to impose it on him. Referring to item "Fifth," we do not perceive what plaintiff had to do with the valuation of defendant's land. He does not pretend to be an expert in real estate, and whether, when formed, the corporation would find the price demanded reasonable or unreasonable, was a question upon which his advice would probably not have been asked.

But if it had been asked, it would have been asked by the corporation, and it is not clear to us in what way he could have served the defendant by advising the corporation in a matter in which they have diverse interests. Moreover, there is absolutely nothing to show that defendant ever, at any time, intimated to plaintiff that he needed, or would ever need, any advice upon the subject. Nor does it appear that he, or any one else, ever obtained any such advice. Why, then, should he have bound himself to pay for it. Dealing with item "Sixth," it will probably be re-

membered that plaintiff, of his own motion, prior to the first business interview with defendant (on February 4th), visited the tract of land in question and came to the conclusion that it was all that it had been represented to be. But defendant, who is a dealer in real estate, had reached that conclusion before. He had bought the land for $25,000, no doubt, because he thought it was worth more money, and whether it was or was not worth more, or was or was not worth the amount for which he proposed to offer it to the club that he was trying to get up, was a question not of law, but of values, and it seems to us hardly likely that he would have been willing to pay a fee for a legal opinion on the subject, nor did he need such opinion as to the method of transferring the property to the club, which was already, in advance, provided with an attorney for the protection of its interests. Apart, therefore, from the fact that defendant swears most positively that he never agreed to pay plaintiff $10,000 for legal advice, we are unable to discover, either from the transcript or from the briefs that have been filed, any reason why he should have done so. We therefore conclude that plaintiff has failed to establish the contract sued on, and hence is not entitled to judgment.

This is all that is necessary to dispose of the case, and we regret that we feel compelled to add anything to an opinion which is already, perhaps, unnecessarily long. Plaintiff has, however, accentuated by his pleadings and his testimony a proposition to which we are unwilling, by silence, to give apparent sanction. He was asked the question:

"Did you ever report to Mr. Heaslip, when you were examining the title, that you had a contract with Friedrichs for $10,000, the payment of which would depend on the Jockey Club's accepting the title?"

His answer was:

"I don't think I did, I don't think I was called on to do that" (to which he added some-

thing which is wholly irrelevant here—the entire answer having been given elsewhere).

We are of opinion that plaintiff was called on to give Mr. Heaslip the information referred to in the question. Mr. Heaslip, as president, with the board of directors (a majority of whom appear to have been equally ignorant of the fact mentioned in the question), represented the corporation of which plaintiff was the attorney. The corporation, through them, might, if it had seen fit, have bought the land from Friedrichs without any other assurance, as to the validity of the title, than his bare statement.

But it did not see fit to buy in that way. It instructed plaintiff, as its attorney, to examine and report upon the title, and it had the right to know, from him, before he assumed the discharge of that obligation, whether he had any interest which was adverse to that intrusted to him. With the information that he was interested to the extent of $10,000—the recovery of which was dependent upon his making a favorable report upon the title—it might or might not have been satisfied with his report, but that was a matter for the corporation to determine after it had been fully informed of the situation. The rule upon the subject is so well established and is so deeply founded not only in legal ethics, but in public policy, that a citation of authority in its support would be a work of supererogation.

We have found, as a fact, that plaintiff was not representing Friedrichs, and, although he appears to have considered that he was representing him, as he was undeniably representing the Jockey Club, there is nothing in the record to authorize the assumption that he allowed his supposed interest, upon the one side, to influence the discharge of the duty that he owed, on the other. His position was, however, legally speaking, impossible, and we have felt constrained to refer to it because it has been, and is, insisted upon.

For the reasons thus assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment for defendant, rejecting the demand of the plaintiff, and dismissing this suit, at his cost.

BREAUX, C. J. I dissent for reasons this day handed down and for reasons assigned in dissenting in case with same title. 42 South. 231.

See dissenting opinion of BREAUX, C. J., 51 South. 672.