**7859**

LA. BUILDING & CONTRACTING CO.

VS                    No. 7859

JOSEPH BENINATI.

November 22d, 1920.

LA. BUILDING & CONTRACTING CO.

VS                                      No. 7859.

JOSEPH BENINATI

Appeal from Civil District Court, Hon. Porter
Parker, Judge.

CHARLES F.CLAIBORNE, JUDGE.

This is suit for rent. The plaintiff alleged that it
had leased from the New Orleans Terminal Company the premises
Nos. 227 and 229 N. Rampart Street; that it had subleased
verbally by the month beginning February 1st, 1917, to the de -
fendant, Joe Beninati, the same premises for the monthly rent
of one hundred and ten dollars payable in advance; that it made
demand for the month of February, which the defendant refused
to pay; making the affidavit required by law, the plaintiff is-
sued a provisional seizure, and prayed for judgment for $110.00
with lessor's privilege and costs. This suit was filed February
6th, 1917.

The defendant denied that he had made a lease with the
plaintiff, and averred that he had no knowledge that plaintiff
held said property under lease from the Terminal Company other
than plaintiff's averment; he further averred that he had been
a tenant of the Terminal Company for about five years at $45.00
*payable at the end of the month,*
per month for the same premises; that he was in possession of
them when he was informed on February 1st, 1917 by the plaintiff
herein, the Louisiana Building and Contracting Co., that it had
secured the lease on said premises; that he asked to see the
lease, which plaintiff failed to exhibit; that plaintiff's
agent then stated to him that, if he desired to remain in said
premises, he would have to pay $110.00 per month, which he re-
fused to pay, or even $45.00 until the end of the month; that
the amount demanded of him was not the amount due, and he did.
not know plaintiff as his landlord; that he still believed
that the Terminal Company was his lessor, as he had never been
notified by said company to the contrary; he denied that he
intended to remove the property out of the premises; and he
prayed that the suit be dismissed. He swore to the truth of
his answer.                    88

There was judgment in favor of plaintiff, and defeniant has appealed.

The case turns entirely upon a question of fact. As there is no written evidence, it depends upon the appreciation of the testimony. Defendant admits that he occupied said premises as the leasee of the Terminal Company at $45.00 per month payable at the expiration of each month. When the plaintiff acquired possession of said premises as lessee of the Terminal Company, it succeeded as subrogee to said company, as lessor of the defendant upon the same terms and conditions, unless the plaintiff and the defendant agreed to different terms. 8 N. S., 560; 44 A,, 256; 117 La., 534. The only question of fact therefore is, did the plaintiff and the defendant make and agree upon new and different terms of lease? The burden of proof rested of course upon the plaintiff, because when a condition of things is shown to exist the presumption is that it continues until a change is proven. 38 A., 53; 15 A., 715; 4 A., 557; 7 R., 238; 16 Cyc, 1052 § 3 Vo. Evidence; 22 A. & E.E. Law p 1238 § 5.

The only eivdence upon the question, on the part of the plaintiff, is the testimony of James J. Gazin, the manager of the plaintiff company. He testifies:

Q. Mr. Gazin, you represent the Louisiana Building & Contracting Co.?

A. Yes, sir.

Q. Did your Company lease from the Terminal Co. the property 227 and 229 N. Rampart Street?

A. Yes, sir, we leased all that property.

Q. I show you this lease, which is already offered in evidence, and ask you if that is the lease?

A. That is the lease; that is my signature on there. (This lease is dated December 22d, 1916.)

Q. Mr. Gazin, after the signing of this lease, did you call on Mr. Beninati with reference to the rent?

A. I had better explain that. A couple of days after I signed up that lease, we started repairing, which the contract said we had to spend so much

money on repairing these buildings. We had to do all the repairs and put them in good condition. We had to spend $1800.00 to put them in condition, so we could get some rent out of them, and Mr. Beninati came over and asked me if we had taken hold of them, that he heard from Mr. Bender, of the Terminal Co., that we had taken them over, and wanted to know if I would let him stay in the building. I told him I would let him stay there provided he paid the rent we asked.

Q. When did you have this conversation?

A. That was somewhere right after New Year, right after the signing of the lease. We started to work on there right after the first of the year.

Q. Now, just after New Year, you had that conversation with him?

A. Yes, and then I told him the rent would be $125.00 for the two buildings, and he figured it with me it would not justify him to keep these buildings at $125.00, as he was getting them previously cheaper, and I figured with him where his tenants were paying him amounting to $140.00 a month, and his rent was free for his pressing—shop and stuff and places where he kepps the automobiles was free. He said:."Well, I would have to think it over"; and a few days after that, he came back at me with a proposition, and asked me to give him the building.

Q. When was that?

A. A couple of days afterwards, and I told him I would take it up with my Company, and about a week afterwards, we started the repairs, and I went to him and told him I had taken it up with my Company, and the very best we could do with him was to let him have those buildings at one hundred and ten dollars rent, paid in advance, in accordance with the Terminal Company's lease, as we had to pay them ours in advance. Then he said: "Well, I would like to stay there", and he wished he would keep the buildings, that he spoke to the tenants, and,

at that time, Mrs. Ryan and all the tenants came over to see me and asked me if I should pay it. x x x I told them if Mr. Beninati wanted the property, I would give him the preference, which my Company agreed to rent to him at $110 per month for the two buildings, which he agreed to take &c" x x x

Q. And I understand you to say, Mr. Gazin, after a discussion as to the rental of these two buildings, an agreement was finally concluded?

A. Yes, at one hundred and ten dollars a month.

Q. And you had that agreement with Mr. Joseph Beninati in person?

A. In person. x x x

On cross examination, the witness repeats this testimony and says that the agreement was made between the 14th and 16 of January, that Beninati never told him what rent he was paying; that when he called for the rent on the first of February, Beninati refused to pay without giving any reasons.

Joseph Beninati testified that he had occupied the two properties 227 and 229 North Rampart Street as the tenant of the Terminal Station Co. for nearly five years at $45.00 a month; that he knew no one else as landlord until February first when Mr. Gazin came to him and asked him to pay the rent to him, $110.00 for the two houses.

Q. Now, state the conversation that you had with Mr. Gazin, what he told you, and what you told him?

A. He told me he is the representative of the landlord, now, and if I want to stay and keep that two houses, I have to pay him $110.00.

Q. What did you tell him?

A. I tell him I don't know he is the landlord; I know the landlord is the Terminal Station Co., and I pay the Terminal Station $45.00 a month when the month is up, not in advance, either, and if he represents the landlord, and he show me any paper after the month is up, I will be satisfied to pay $45.00.

Q. Did you and Mr. Gazin enter into any agreement?

91

A. No, sir, we have no agreement.

Q. Did you ever agree to pay him $110.00 in advance?

A. No, sir.

Q. Did you agree to anything with him?

A. No, sir, nothing at all. x x   On the same day, on the
first of February, in the evening, about six or seven
o'clock two other gentlemen came along down there, and
they told me they was the representative, the collec-
tor for the Louisiana Contracting and Building Co., and
they want to collect $110.00 from me.  I say: "How do
I know who you are?  I pay my rent to the Terminal
Station Co., and I pay $45.00 for that two house".
They say:  "So you absolutely refuse to pay".  I say:
"Certainly, I refuse to pay, because I pay to nobody
outside of the Terminal Co." and they walked off; I
invite them to come in, and they walk out and never
say nothing. x x x

In the presence of this conflict, we must apply the
rule of law that witnesses must be weighed not counted.  If both
witnesses, one practically the plaintiff, and the other the de-
fendant, appeared before us equally as credible, plaintiff could
not recover. But if the credibility of one of them has been im-
peached, then the scales of justice must incline towards the
other. Nothing to which the plaintiff's manager, Gazin, has tes-
tified has been contradicted except by the defendant.  Not so
with the defendant.

I.  He averred and reiterated, in his sworn answer, that
he was not aware, prior to the first of February, that his les-
sor, the Terminal Co., had leased the premises to the plaintiff
herein, the Louisiana Building and Construction Company; he tes-
tified to that fact repeatedly, and gave it as one of the reasons
why he would not pay plaintiff when it called upon him for the
rent on February 1st.

His testimony on that point is contradicted by the tes-
timony of two disinterested witnesses, as follows:

Mr. W. S. Bender says:

Q. Mr. Bender, in whose employ are you?

A. I am now employed as Chief Clerk to the Vice-President of the N.O. and North-Eastern and the New Orleans Terminal Co., and the Executive General Agent of the Southern Railway.

Q. And in that capacity, you take cognizance of the general business of the Company, the leasing of buildings and so on?

A. Yes, sir, we will do that. It might be well to state that my position now is different from what I occupied formerly, especially at the time that the leasing of the property under consideration in this case was taken up. At that time, I was Secretary of the N. O. Terminal Co., and served as Chief Clerk to the General Manager of the Terminal Co. , who had direct charge of the leasing of all of these properties along Rampart Street, and, as his Chief Clerk, I personally prepared and handled all of the conditions respecting the leasing of these properties to the Louisiana Building and Contracting Company."

Q. Now, Mr. Bender, after this lease was entered into, did you have any conversation with Mr. Beninati regarding the leasing of this property by the Louisiana Building & Contracting Co.?

A. Yes.

Q. Will you please state the nature of that conversation?

A. The occasion of my talking at all to Mr. Beninati was by reason of the fact that Mr. Kelly happened to be out of the office one afternoon; I am not certain about the date, but I think it was early in January, shortly after this lease was drawn. All of my dealings with the Louisiana Building and Contracting Co., all of Mr. Beninati's dealings in connection with the ratproofing work and the subsequent prospective lease of this property had been handled by him with Mr. Kelly. It happened that early in January, I think, or the latter part of December, he called at the office in company with some gentleman to ask about the ratproofing of these proper-

ties. I explained to him that Mr. Kelly was not in, and, in the course of the conversation, he inquired as to this ratproofing work, and I told him that a contract had been let with the Louisiana Building and Contracting Co. for that work. Either he or the gentleman who accompanied him asked something about the lease of this property, and I said to him: "We have leased these properties to the Louisiana Building and Contracting Co.". The gentleman who was with Mr.Beninati simply threw up his hands about in that fashion (Indicating): "Well, we are losing our time here talking about this proposition; it is closed up". There was nothing else I could tell the gentleman, because this contract had been signed absolutely with the Louisiana Building & Contracting Co. in December, the 22d of December, the contract shows". x x x I make that statement to show how little attention we paid to the propriety of this gentleman being notified, but he was notified by me, as a positive fact".

Q. You gave him to understand that this lease would go into effect from the first of February on?

A. Yes, sir. x x x

Although Beninati admitted that conversation with Mr. Bender, he again denied that the latter had informed him that the property had been leased to the plaintiff. But he failed to produce the gentleman who had accompanied him as a witness to Mr. Bender's office, to corroborate his own testimony and contradict that of Mr. Bender, nor does he account for his absence.

John S. Powell is next examined. He says:

Q. Mr. Powell, in whose employ are you at present?

A. N. O. Terminal Company, for the last 16 years. I am Auditor for the Company.

Q. Did you have any conversation with Mr.Beninati relative to a lease of certain properties from the N. O. Terminal Company to the Louisiana Building & Contracting Co?

A. I advised him personally in my office that the buildings were rented to the Louisiana Building & Demolishing Co.

94

due to the contract that was let by Mr. E. A. Kelly.

Q. And you told him when the new landlord would take possession?

A. Yes, sir.

Q. When did that conversation occur?

A. I think that was some time in the latter part of December.

There is no specific denial by Beninati of the testimony of this witness, nor of the fact that he received notice from him.

There is no doubt that the preponderance of the testimony upon this question of notice is with the plaintiff, and that this Court must come to the conclusion that Beninati did not testify truthfully upon this point. 10 M., 677.

In Singer vs Carondelet Canal Co., 39 A., 484 the Court said:

"On the 23d of August, 1884, the defendant Company gave Otto Touche written notice that the privilege granted him to run a flat across the Bayou was withdrawn. He denies having received the letter, but a witness swears positively that he handed it to him, and we are inclined to believe his statement, as he is without interest in the suit." 33 A., 1349.

Where the testimony of plaintiff is contradicted by that of defendant, judgment will be given in favor of the party having the preponderance of evidence. 23 A., 501; 125 La., 619 (638).

The testimony of a witness which is successfully contradicted as to one fact in the case, will not be sufficient to establish another fact in the same case. 26 A., 591 (592).

The maxim "Falsus in uno, falsus in omnibus" is another element destroying the credit of this witness. 2 Evans Pothier p 184; 30 A.& E.E. L.p 1072; 107 La,, 298; 40 Cyc, p 2586; 7 Wheaton, 334 (335).

II. Beninati also testified that he owed only one month's rent, December 1916. The Auditor of the Terminal Company swore he owed four months anterior to February. 1st, 1917. Beninati promised to produce the receipts to corroborate his testimony; no receipt is in the record for December 1916. There is a

receipt dated November 20th, 1916 for $20.00 for the house 227
N. Rampart Street for the month of August 1916; the next receipt
is dated December 4th, 1916 and is for $100.00 for rent of "houses
on N. Rampart Street"; out besides 227 and 229 Rampart, Beninati
also rented from the Terminal Company Nos. 337, 343, and 345
N. Rampart Street.

Mr. Powell testifies:

A. "He (Beninati) was not accustomed to paying any regular
time. We were always after Beninati to pay that rent,
and that is the reason he was back, and we contemplated
filing suit against Beninati for that back rent".

In an inquiry concerning the veracity of a witness his
character for honesty may be examined. 45 A., 508.

Besides the conclusions of law to which we have just referred✗ this case depends upon the veracity of witnesses. The
Judge of the Trial Court saw and heard Beninati testify; he decided against him, and we see nothing in this record that would
justify us in reversing his judgment, but on the contrary much
to confirm it. 109 La., 520 (524).

In Ball, Lyons & Co. vs Lignoski, 24 A., 484, the Court
said:

"In the first place it must be remembered that the Judge
saw and heard the witnesses, and so far as there may be
any conflict his decision must have great weight, and
ought not to be reversed unless manifestly erroneous".
6 M., 421; 47 A., 1446.

In Laford vs Weber, 23 A., 253, the plaintiff sought
to make the defendant, a sheriff, liable for failure to return
an execution within the delay required by law. There was judgment for defendant: The Court said:

"In this case the Sheriff alleged, and offered evidence
to establish, a legal excuse, that he acted under the
advice and direction of the attorney of the party in
whose favor the writ was issued. The Sheriff and the
Attorney (for plaintiff) alone have testified in this
case. The former states positively that the attorney
authorized and instructed him to retain the writ in

his hands, while the attorney denies it as positively. The question to be decided being one of fact, the opinion of the judge a quo before whom the witnesses testified is entitled to great weight. Quoting 6 La., 31; 13 La., 412; 3 A., 163; 21 A., 169.

The judgment in favor of the defendant was affirmed.

For these reasons the judgment in favor of plaintiff is affirmed.

November 22d, 1920.