Statement of the Case.
MONROE, C. J.
The parents of Lucien Pierre, a minor, bring this suit for the recovery of damages for injuries sustained by him, and his death, alleged to have been caused by the negligence of his employer, the defendant company, in requiring him to perform a certain function for which he was not qualified and the danger of which was not made known to him. The defense is that the boy assumed the discharge of the function in question without instructions and at his own risk.
It appears from the evidence that he was a colored boy who had spent his life, until employed by defendant, in the country, and had had no experience with machinery of any kind; that during 7 or 8 months prior to the accident whereby he was injured he had been employed by defendant, mainly in trundling a wheelbarrow, and now and then “stacking veneering,” and odd jobs; that at the moment of the accident defendant, through its employés, was engaged in pulling from a bayou (sometimes called “river”) certain squared timbers which were to be used in building a box factory; the physical situation and the positions of the different persons who were on or about the scene, as stated by defendant’s witnesses, being as follows: The timbers were in the bayou, opposite the log deck of the mill, and at a distance of 135 or 145 feet from the bull wheel, by means whereof, and of a wire cable operated by it, they were pulled from the bayou to the deck. The bank of the bayou intervened between the stream and the wheel, attained its summit at a distance of 90 or 100 feet, and bore upon its face and slope a runway, or “log slip,” over which the logs were pulled. The space (of 45 feet) between the summit and the wheel was occupied by the log deck and carrier, and the situation was such that persons standing near the wheel and the edge of the bayou, respectively, were not visible to each other. A moment before the accident here in question, Mr. Pierson, defendant’s superintendent, was standing near the summit of the bank. I-Iennericks, the millwright and engineer, was standing about 10 feet to the rear of Pierson, in the direction of the wheel. The boy -was standing right behind the wheel. Jimmie Cousin, whose duty it was to attach the cable to the timbers, was at his post in the bayou, or upon the edge of the bayou, and Joe Todd, who was charged with the operation of the wheel, but who, upon that occasion, had left the wheel in order to take the end of the cable to Cousin, was with him at the bayou. The position of the boy is variously accounted for as follows: I-Ie testified (in a case that was nonsuited prior to his death) that he was called there by Mr. Pierson to work by the bull wheel, and that Pierson gave him the order to stop the wheel, in the execution of which he was injured. Two bosrs, Baptiste and Ducre (one of them a cousin of the boy that was injured), testify that they were standing near the fire door of the boiler on top of a big pile of sawdust engaged in unloading boards from a 'wagon, and heard Pierson call Lucien (by his nickname — ■ “Ghouie”), and tell him to stop the wheel, and that, in attempting to do so, “Chouie’s” arm was caught. Baptiste says that it was he who unscrewed the wheel and took the arm out, and there is no testimony to the contrary on that subject, though E’d. Cousin, who was “firing the boiler,” testifies that he was in front of the fire door and saw neither Baptiste nor Ducre about there at that time, *1001 though they came lip afterwards from the direction of the mill. Mr. Pierson testifies that he was on the log deck when the accident happened, but did not see it, and, farther, as follows:
“Q. How was it you didn’t see it? A. I happened to be watching the bayou. * * * Q. Mr. Pierson, describe the work being done at that time. A. Well, we were pulling up square timber for the construction of the box factory; I finished pulling at three; called Jim Cousin, my log man, to go and get this Pierre boy to help him at the bayou to bring timber to the mill; called Albert Hennericks and Joe Todd to come with me to start the mill so as to pull up the timber we had up. Up to the time of the accident, we had pulled up three or four timbers — Joe Todd operating the bull wheel; * * * either one or the other, Joe Todd or Hennericks. The Pierre • boy being slow in taking the cable back to the bayou, Joe Todd, in order to help rush the work, took the cable and carried same to the bayou, consequently leaving the Pierre boy on the log deck. Not having quite enough slack, James Cousin asked for more slack, which I started to give him, but Mr. Hennericks, being nearer the bull wheel, also caught the signal, started for the bull wheel himself; consequently, being .nearer, I stopped and started in front of the mill. When we had enough slack, I says, ‘That will do.’ About that time I heard the boy holler. * * * My back was turned at the time he hollered; his hollering attracted my attention. Mr. Hennericks ran down stairs; stopped the engine. Ed. Cousin, who was at the boiler with Joe Todd, rushed for wrenches to take the machine apart, so as to get the boy out. Q. Who was there at the time of the accident? * * * A. Jimmie Cousin, Joe Todd, were at the bayou; Albert Hennericks, myself, and the boy were on the log deck; * * * Ed. Cousin was at the boiler. Q. What was Pierre doing there ? A. He was intended to pull th" chain to the bayou, but, being slow, Joe Todd, in order to rush things, went down with th“ chain. Q. Had you sent for Pierre? A. I sent Jimmie Cousin to get Pierre to help him. Q. And the work he was to do was what? A. To pull the cable to the bayou. Q. After the log was hauled up, he was to take the slack cable and pull it down to the bayou? A. Yes, sir. * * * Q. I want you to tell the court whose duty it was to operate the machinery, and particularly this bull wheel. A. Joe Todd. Q. Was anybody else there to operate that machinery? A. Albert Hennericks. * * * Q. Tell the court who ordered Lucien Pierre to stop that bull wheel. A. No one; he had absolutely no business there. • * * Q. This boy, Pierre, had never operated this machinery at all, had he? A. No; he never had any business there. Q. As a matter of fact, if you had known that this boy was gone [going] to that wheel, would you have forbidden him to do it? A. I know that he absolutely knew nothing about running the machinery. Q. At the time this accident happened, or just before it happened, who was the closest to the bull wheel? A. Albert Hennericks. Q. And you naturally assumed that he was? A. Well, when they called for slack, I started back to give them more slack; seeing Mr. Hennericks nearer the bull wheel, I stopped to let him go and give slack, not knowing the Pierre boy was going there at all.”
On cross-examination:
“Q. Mr. Pierson, you say that you did not employ this boy to run that bull wheel? A. No, sir. Q. You did not order him to do so? A. No, sir. * * * Q. At the time of this accident, you say that you were standing on the log deck? A. Yes, sir. Q. Plow far from the bull wheel? A. About 45 feet. * * * Q. Therefore the bull wheel is 45 feet from the top of the log slip? A. Yes, sir. Q. Were you standing at the top of the log slip? A. Yes, sir. Q. Where was Lucien Pierre? A. Over near Albert. Q. Was he standing further away from the bull wheel than Albert was, or nearer? A. I don’t remember the exact position of them, but they were very near together; I think Albert was nearest the bull wheel. Q. What was Lueien’s business — standing at the bull wheel? A- He had absolutely no business standing there at all; if he had been tending to his work, he would have been at the bayou.”
Jimmie Cousin testifies, in part, as follows:
“Q. Where were you at the time of the accident to Lucien Pierre? A. I was down at the river, hooking on logs. Q. What was Lucien Pierre doing at the time? A. He was to help me pull the cable down to the river. Q. How did he happen to come there? A. Mr. Pierson sent him there. Q. Mr. Pierson told him to go over and help you pull the cable down, and that is what you told him to do? A. Yes, sir. Q. Whose duty was it to operate the machinery of that mill? A. Either Joe Todd or Albert Hennericks. Q. What did Pierre have to do with operating the machine, and particularly the bull wheel? A. I don’t know; he didn’t bring him up there for that.”
Cross-examination:
“Q. You were at the bayou at the time of the accident? A. Yes, sir. * * * Q. Where was Joe Todd? A. Pie was right by me, down at the bayou. Q. Where was Lucien Pierre? A. I couldn’t see him at all from where I was.”
Redirect:
“Q. Who ordered Pierre to operate that ma- , chine? A. That I don’t know.”
*1003 Albert Hennericks gives tlie following (with other) testimony:
“Occupation, millwright and engineer. * * * Q. Where were you at the time of this accident? A. In the mill, on the log deck. Q. Did you see the accident? A. Well, I seen the boy as he got caught. Q. Describe the work being-done at that time. A. Well, this boy was supposed to help Jimmie Cousin take the cable down to the bayou, and, being too slow, Joe Todd took the cable down in his place. * * * Q. Now, how did this accident happen? A. Well, I can’t tell you how it did happen, only when I turned around to go to the bull wheel and give more slack, and then this boy grabbed the wheel, and, as he grabbed it, I knew he was going to get caught, and I went to the engine and shut it off. Q. Who was there at that time; I mean on the log and on the mill platform? A. Mr. Pierson and myself and this boy. Q. What was Jim doing? A. Fastening on the logs. Q. Where was Joe Todd at that time? A. He was at the water’s edge, too. ■ Q. He had just carried the cable down? A. Yes, sir; and this .boy, as I left the bull wheel, he was just behind me. Q. What was he supposed to be doing there? A. He was supposed to take that- cable back instead of Joe Todd. Q. Tell the court whose business it was to operate the machinery, and particularly this bull wheel. A. Joe Todd, or either me or Mr. Pierson, would do it if he wasn’t there. Q. Who was operating it at that time? A. No one that I know of. Q. State whether or not you heard Mr. Pierson tell Lucien Pierre to stop the bull wheel. A. No, sir; I did not hear. Q. If he had told him that would you have heard it? A. I think I would because I was within a few feet of him.”
Cross-examination:
“Q. How far were you from Mr. Pierson? A. Somewhere in the neighborhood of 10 feet, more or less. Q. How far was Lucien Pierre from Mr. Pierson? A. That, I couldn’t tell you; I didn’t hardly know where the boy was at the time, but when I turned around I saw the hoy grab the wheel. * * * Q. Mr. Pierson has testified that he was standing about 45 feet from the bull wheel, and you were standina- 10 feet further in the mill? A. Yes, sir. Q. Then you were about 35 feet from the bull wheel? A. Somewhere in that neighborhood. * * * Q. You were not present when Mr. Pierson sent for Lucien Pierre? A. No, sir. Q. You don’t know what he told1 him, or what he brought him there for? A. No, sir; Jimmie Cousin was the man that went after him.”
Mr. Pierson and Mr. Sellers (the latter being the claim agent of the defendant) called at the residence of the plaintiffs 8 days after the accident, and found there a daughter of the plaintiffs. Mr. Pierson testifies that he asked the girl for her mother, but was told that she was not at home; that they [we] then asked- if they had a certificate of the birth of the boy, and were informed that they had it in the family Bible, but that she (the girl) did not know where the Bible was; that he expressed his regret that the boy had been hurt, and that Mr. Sellers did the rest of the talking. He denies that he told the girl that, had he known that the boy knew nothing of machinery, he would not have employed him; that he admitted that it was through bis ordering him to stop the bull wheel that he was injured; or that he gave that order because they were short-handed.
Mr. Sellers testifies that he inquired for the boy’s father, and was informed that he was not at home; that something may have been said about its being a distressing accident; that nothing more was said by him; and that Mr. Pierson said nothing more except that he was sorry that the boy had been injured. It appears that the mother of the boy (as well as the sister) was at home on the occasion of the visit in question; that the mother did not wish to appear, but heard the conversation between her daughter and the visitors. They both testify that Mr. Pier-son told them that he had put the boy to work because he was short-handed, and that he would give him an education. The boy’s right' arm was caught between the bull and the friction wheels and crushed, as a stalk of sugar cane is crushed between the rollers of a mill, and he sustained serious injury to his side. 1-Ie was sent to the Charity Hospital, in New Orleans, where his arm was amputated at the shoulder, and he remained for about 5 months, after which he returned home, where he died about a year later of tuberculosis' of the lungs attributed by his attending physician to lowered vitality, resulting from his injuries.
*1005 Opinion.
Mr. Pierson was asked, on cross-examination, whether he had not told the boy’s sister that he had made him run the bull wheel because he was short-handed, and he replied, ■“I did not; I had more men that day than I needed.” But it is evident that he needed •another man upon the particular job that he was engaged in superintending, for he either ordered the boy to come there, or sent Cousin for him (and we shall consider that ■matter presently), apart from which the facts speak for themselves. He was superintending the job; Hennericks was the millwright and engineer; Joe Todd was operating the bull wheel; Jimmie Cousin was at, and in, the bayou, hooking the cable to the timbers; •and the dragging of the cable back to the bayou as the timbers were pulled up was not the kind of work that would have been expected of either of those men; it was the job of a boy, or unskilled man, and the boy, Lucien Pierre, was called upon.
Mr. Pierson says, “I sent Jimmie Cousin to get Pierre to help him.” The boy says that Mr. Pierson took him from the work in which he was engaged, brought him in the mill, and set him to work by the bull wheel. “He came and brought me to the mill. * * * And they sent me by the bull wheel to pull them [the timbers] off — the foreman [meaning Pierson] — where I got hurt.”
Jimmie Cousin testifies that at the time of the accident he was “down at the river, hooking on logs.” Being asked how the boy happened to come over there, he replied, “Mr. Pierson sent him down.” Speaking of the accident Mr. Pierson says:
“Not having quite enough slack, James Cousin asked for more slack, which I started to ■give him, but Mr. Hennericks, being nearer the bull wheel, also caught the signal, started for the bull wheel himself, consequently, being nearer, I stopped, and started in front of the mill; when we had enough slack I says, ‘That will do.’ About that time I heard the boy ■holler.”
It seems very clear that when Cousin called for more slack the bull wheel was at rest —neither paying out the cable nor pulling it in. In order, therefore, to meet the demand for more slack, it was necessary that the wheel should be started; and in order to stop the supply when the demand was satisfied it was necessary the wheel should be stopped. It seems important, then, in view of the relative positions occupied by Pierson, Hennericks, and the boy, that we should know wbo started the wheel when Cousin demanded more slack. Pierson and Hennericks received the signal, and the boy, standing by the wheel, could not have known that the signal had been given, unless, and until, informed by some one who had received it. But Mr. Pierson gives us no information on that subject further than that when he received the signal he turned towards the wheel, and turned back upon seeing Hennericks starting in tbe same direction. But when he turned his face to the wheel and saw Hennericks, he could hardly have helped seeing the boy, who must, at that moment, have started the wheel, since Hennericks also turned back, and there was no one else there to start it; and if he saw the boy start the wheel, to whom could it be supposed that he was addressing himself, when, a moment afterwards, seeing that enough slack had been payed out, he said, “That will do”?
Why is it that neither he nor Hennericks has informed the court who started the wheel? • Pierson knew that he did not start it. Hennericks knew that he did not start it. They both knew that it was not likely to have started itself, and that, as there was no one else who could have done so, the boy must have started it. Why, then, should they ¿retend to be surprised that, when Pier-son said, “That will do,” the boy attempted to stop tbe wheel? He says, in effect, that he was put there to operate the wheel, and *1007 Ms testimony seems to tie sustained by tbe facts, thoügh, as we think, that arrangement was to have been only for the particular occasion, and because Todd had, for the moment, taken the place to which the boy was to be assigned. The boy testifies that he had been there but three or four minutes when the accident happened, and Mr. Pierson says that three timbers had previously been pulled up. We take it, therefore, that the hoy arrived on the scene a little late for the carrying down of the cable for the fourth timber, and that, as Todd had already taken it, or started with it, the boy was stationed at the wheel, to remain until Todd came back; and we find it remarkable, under the circumstances, that Mr. Pierson should, at one time, account for the boy being on the log deck by saying, “He was intended to pull the chain to the bayou, but, being slow, Joe Todd, in order to rush things, went down with the chainat another time should say (in answer to the question, “Tell the court who ordered Lucien Pierre to stop that bull wheel”), “No one; he had absolutely no business there;” at another, “He had absolutely no business standing there at all; if he had been tending to his work, he would have been at the bayou;” and at still another (answering the question, “Now, when you say Joe Todd had taken Pierre’s place, that was just temporarily, was it?”), “Just for the one time, Pierre being slow, he did it to rush matters.” If, however, Pierre was too slow for the work, we imagine that he would have been sent back where he came from. On the other hand, if he was merely slow in arriving on the scene, and did not get there until after Todd had taken the cable,. or chain down to the bayou, it can be readily understood why he remained on the log deck, and it appears to us that he was put temporarily in Todd’s place, upon the chance that, for once, he might be able to discharge Todd’s function, of starting and stopping the | bull wheel. Taking all the circumstances together, we find no sufficient reason to discredit the testimony of the boy and the two other boys to the effect that he was told to stop the wheel. It is true that Ed. Cousin says that he did not see the other boys near the fire door of the boiler, but they say that they were there; the testimony of Baptiste that it was he who unscrewed the wheel and released the boy’s mangled arm is entirely uncontradicted, and is conclusive to the effect that he must have been very near at hand when the arm was caught and crushed; and it is not disputed that he and the other boy were working together, unloading the same wagon.
Upon the whole, we are of opinion that the evidence justifies the conclusion that plaintiff’s son was injured, as alleged in the petition, in consequence of his attempting, under orders from defendant’s representative, to discharge a function for which, to the knowledge of such representative, he possessed no qualification, and of the danger of which he was ignorant and not advised; and, in view of the fact that plaintiffs are suing in the right of the deceased, who suffered much during the, say, 17 months which intervened between the accident and his death, and, also, in their own right, for the loss, by death, of the prospective support, companionship, and filial affection upon which they were entitled to rely, we are further of opinion that the damages awarded by the district court should be increased from $2,500 to $7,500. It is therefore adjudged and decreed that the judgment appealed from be amended by increasing the award of damages, as made by the district court, from $2,500 to $7,500, and, as amended, affirmed, at the cost of the defendant.
O’NIELL, J., is of the opinion the judgment should be affirmed.